AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**

# UNITED STATES DISTRICT COURT

United States District Court
Albuquerque, New Mexico

for the

District of New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

IN THE MATTER OF THE SEARCH OF INFORMATION
THAT IS STORED AT PREMISES CONTROLLED BY
GOOGLE, 1600 AMPHITHEATRE PARKWAY,
MOUNTAIN VIEW, CALIFORNIA 94043

)
)
)
)
)
)

Case No.   **22mr1161**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 249 | Hate crime offenses involving actual or perceived race, color, religion, or national origin |

The application is based on these facts:
See attached affidavit, submitted by SA Robert Balint and approved by AUSA Kimberly Brawley.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Robert T. Balint, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_Telephonically sworn and electronically signed_ *(specify reliable electronic means)*.

Date:  August 7, 2022 at 1:55 pm

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico

*Printed name and title*: John F. Robbenhaar, USMJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, 1600 AMPHITHEATRE PARKWAY, MOUNTAIN VIEW, CALIFORNIA 94043 | **FILED UNDER SEAL**<br><br>Case No. |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent, Robert T. Balint, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information that is stored at premises controlled by Google, a provider of electronic communications service and remote computing service headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Google to disclose to the government copies of the information further described in Attachment B.

2.     I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since December 2020. My primary investigative responsibilities include complex financial crimes.  I have received training

in complex financial crimes.  During my career, my investigations have included the use of various surveillance techniques and the execution of various search warrants.

3.     This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.  The information set forth in this affidavit was derived from my own investigation and/or communicated to me by other employees of the FBI and other law enforcement agencies, and from records and documents that I, and others, have reviewed.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 249 (Hate crime offenses involving actual or perceived race, color, religion, or national origin) are being committed by unknown persons. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

6.     Based on my training and experience, I know that cellular devices, such as mobile telephones, are wireless devices that enable their users to send and receive wire and/or electronic communications using the networks provided by cellular service providers.  In order to send or receive communications, cellular devices connect to radio antennas that are part of the cellular network called "cell sites," which can be mounted on towers, buildings, or other infrastructure.

Cell sites provide service to specific geographic areas, although the service area of a given cell site will depend on factors including the distance between towers, and as a result information about what cell site a cellular device connected to at a specific time can provide the basis for an inference about the general geographic location of the device at that point.

7.      Based on my training and experience, I also know that most cellular devices have the capability to connect to wireless Internet ("wi-fi") access points if a user enables wi-fi connectivity.  Wi-fi access points, such as those created through the use of a router and offered in places such as homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

8.      Based on my training and experience, I also know that many cellular devices feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a mobile device and Bluetooth-enabled headphones.  Bluetooth uses radio waves to allow the devices to exchange information.  When Bluetooth is enabled, a mobile device routinely scans its environment to identify Bluetooth devices, which emit beacons that are within range.

9.      Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology.  Using this technology, the phone can determine its precise geographical coordinates.  If permitted by the user, this information is often used by apps installed on a device as part of the app's operation.

10.     Based on my training and experience, I know that Google is a company that, among other things, offers numerous online-based services, including email (Gmail), navigation

(Google Maps), online file storage (including Google Drive, Google Photos, and YouTube), messaging (Google Hangouts and Google Allo), and video calling (Google Duo). Some services, such as Gmail, online file storage, and messaging require the user to sign in to the service using their Google account. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address. Other services, such as Google Maps and YouTube, can be used while signed in to a Google account, although some aspects of these services can be used even without being signed in to a Google account.

11.     In addition, based on my training and experience, I know Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every cellular phone using the Android OS has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

12.     Based on my training and experience, I know that, in the context of mobile devices, Google's cloud-based services can be accessed either via the device's Internet browser or via apps offered by Google that have been downloaded onto the device. Google apps exist for, and can be downloaded to, phones that do not run the Android OS, such as Apple devices.

13.     Based on my training and experience, I know that Google collects and retains location data from devices running the Android OS when the user has enabled Google location services. Google then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising.

14.     In addition to the information that Google collects directly from users of their services, Google passively collects location data and other identification data from users. For

4

instance, in the regular course of business, Google collects data from smartphone users that use

its mobile applications (e.g., Gmail, Google Maps, the Google App), users that use Android

devices, and even users that use other applications that incorporate the digital advertising tools

that Google provides to advertisers and publishers. Google collects and retains data from non-

Android devices that run Google apps if the user has enabled location sharing with Google.

Google typically associates the collected location information with the Google account

associated with the Android device and/or that is signed in via the relevant Google app.

      15.     The location information collected by Google is derived from sources including

GPS data, information about the cell sites within range of the mobile device, and information

about wi-fi access points and Bluetooth beacons within range of the mobile device. Google

blends those sources of data together to create user profiles. Google provides some information

about users for free, through their Google Analytics tools. But much of this data is collected and

sold for profit or used (i.e. to deliver targeted advertising opportunities to companies' advertising

through Google using their AdSense network). In the third quarter of 2018, Google's revenue

from advertising reportedly accounted for $24.1 billion of its overall $27.77 billion revenue.

Thus, Google has a business incentive to, and does, gather location and user data in a variety of

ways through a number of techniques. And while location information for users of Android

devices is particularly robust, through the prolific nature of its services and analytical tools for

advisers and publishers, Google is able to gather this data for a substantial number of smartphone

users.

      16.     Location data, such as the location data in the possession of Google, can assist in

a criminal investigation in various ways. As relevant here, I know based on my training and

experience that Google has the ability to determine, based on location data collected via the use

of Google products as described above, mobile devices that were in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with. Among other things, this information can inculpate or exculpate a Google account holder by showing that he was (or was not) near a given location at a time relevant to the criminal investigation.

17.      Based on my training and experience, I know that when individuals register with Google for an account, Google asks subscribers to provide certain personal identifying information. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

18.      Based on my training and experience, I also know that Google typically retains and can provide certain transactional information about the creation and use of each account on its system. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, Google often has records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an

IP address, IP address information can help to identify which computers or other devices were used to access the account.

## **PROBABLE CAUSE**

19.     On or about August 6, 2022, FBI Albuquerque received information regarding five shootings that occurred in Albuquerque, NM in the past nine months, four of which occurred in the last 17 days, in which the victims are/were of Afghan and Pakistani national origin. Specifically, Victim 1, Victim 2, Victim 3, Victim 4, and Victim 5 are/were of Afghan and Pakistani national origin and/or belong to local Muslim communities.  These victims do not appear to be related other than their actual or perceived race, color, religion, or national origin.

20.     I reviewed Albuquerque Police Department (APD) incident report #210088890 dated November 7, 2021.  At approximately 6:40 p.m. on November 7, 2021, Victim 1, an Afghan man, was found deceased with a gunshot wound to the head in the vicinity of 1401 San Mateo Boulevard NE, Albuquerque, NM 87110, a halal market.  According to APD, APD's preliminary examination of ballistic evidence indicated that the bullet that killed Victim 1 likely originated from a 7.62 millimeter (mm) cartridge.

21.     According to APD Detective 1, the detective assigned to the homicide investigation of Victim 1, video footage was recovered from the murder scene that shows a light-colored sedan pull through the area where Victim 1 was sitting at the time of the incident.  A witness reported remembering hearing what she or he believed to be a firecracker explode at approximately 6:15 p.m.  At approximately 6:40 p.m., the witness saw Victim 1 lying on the ground in a pool of blood outside the halal market and called 911.

22.     I reviewed APD incident report #220055666 dated July 21, 2022.  APD officers responded to a Shotspotter call of approximately five shots at approximately 7:30 a.m. in the

7

vicinity of 501 Columbia Drive SE, Albuquerque, NM 87106.  Victim 2, an Afghan man,

reported that a black or gray vehicle drove next to Victim 2's vehicle.  The driver of the vehicle

fired multiple shots at Victim 2's vehicle, all of which missed Victim 2. Victim 2 reported that

there was no altercation that preceded the shooting. Witnesses reported hearing approximately

four to five shots being fired and seeing a red, brown, silver, or gray sedan leave the area at a

high rate of speed. One witness reported seeing a young black male as the driver of the sedan

that drove away at a high rate of speed.

23.     I reviewed APD incident report #220057197 dated July 26, 2022.  At

approximately 8:00 p.m. on July 26, 2022, Victim 3, a Pakistani man, was found deceased in the

vicinity of 420 Rhode Island Street NE, Albuquerque, NM 87108.  Victim 3 had multiple

gunshot wounds.  Responding APD officers were in the area when they heard approximately 20

shots fired.  There were approximately eight casings recovered from the scene, later identified by

APD as having originated from 7.62mm cartridges. A witness reported hearing shots being fired

and observed a white vehicle traveling southbound on Rhode Island Street at a high rate of

speed.

24.     I reviewed APD incident report #220058958 dated August 1, 2022.  At

approximately 9:20 p.m. on August 1, 2022, Victim 4, a Pakistani man, was found deceased in

the vicinity of 422 Cornell Drive SE, Albuquerque, NM 87106.  Victim 4 had multiple gunshot

wounds with at least one gunshot wound to the head.  There were approximately 13 casings

recovered from the scene.  Recovered casings were identified by APD as having originated from

7.62mm cartridges as well as from 9mm cartridges.

25.     According to APD Detective 2, the detective assigned to the homicide

investigation of Victim 4, two witnesses reported seeing a gray vehicle in the vicinity at the time

of the incident. An additional witness reported seeing a white vehicle in the vicinity at the time of the incident.

26.     According to APD, the National Integrated Ballistic Information Network (NIBIN) identified that the evidence acquired from the 7.62mm casings recovered from both the July 26, 2022 and the August 1, 2022 homicide scenes as a presumptive match. A presumptive match is found when casings are entered into the NIBIN computer system. The computer identifies a match based on physical similarities. The match is then sent to a correlator, who is a technician with the Bureau of Alcohol, Tobacco, and Firearms (ATF). The correlator confirms the computer's match and designates the casings to be a presumptive match. According to APD, a confirmed match requires a presumptive match to be examined and confirmed by APD technicians.

27.     I reviewed APD incident report #220060279 dated August 6, 2022.  At approximately 11:57 p.m. on August 5, 2022, APD officers found Victim 5, a Pakistani man, deceased in his parked vehicle in the vicinity of Lutheran Family Services, 230 Truman Street NE, Albuquerque, NM 87108.  Victim 5 had gunshot wounds to his left arm and head. According to witnesses interviewed by FBI and APD personnel, prior to arriving to the vicinity of 230 Truman Street, Victim 5 had attended a funeral service for Victim 3 and Victim 4 at the Islamic Center of New Mexico, 1100 Yale Blvd SE, Albuquerque, NM 87106 that began at approximately 1:45 p.m.

28.     Video footage obtained from the Islamic Center of New Mexico was reviewed by APD and FBI personnel.  The footage showed Victim 5's vehicle departing the Islamic Center of New Mexico, at approximately 3:41 p.m., after the funeral service for Victim 3 and Victim 4.

Traffic camera footage was reviewed by APD personnel and showed what appeared to be a light-colored four-door sedan, possibly identified as a Volkswagen Jetta, following Victim 5's vehicle.

29.     APD and FBI personnel reviewed video footage obtained from Lutheran Family Services from August 5, 2022.  At approximately 3:53 p.m., Victim 5's vehicle parks in the parking lot.  Victim 5's vehicle is followed by a light-colored sedan that appears to be the same vehicle, possibly identified as a Volkswagen Jetta, that was observed following Victim 5's vehicle on traffic camera footage.  In video footage, APD and FBI personnel observed what appeared to be gunshots hitting Victim 5's vehicle at approximately 4:10 p.m. According to Detective 2, a witness nearby reported hearing a loud bang at that approximate time and observed an unknown individual shooting from a gray four-door sedan. The sedan then departed the scene.

30.     I was also advised of another homicide that occurred on July 11, 2022, in the same area as where Victim 5 was murdered.  I reviewed APD incident report #220053011. At approximately 10:06 p.m. on July 11, 2022, a woman of Chinese descent ("the decedent") was found deceased in a parked vehicle in the vicinity of the intersection of Grand Avenue NE and San Mateo Boulevard NE, Albuquerque, NM 87108.  The decedent's friend was in the immediate vicinity and heard approximately three gunshots. The decedent's friend turned and saw a dark-colored van leaving the scene. The van had been parked across the street from the decedent's friend's vehicle, in which the Victim 6 was found. Victim 6 was found with multiple gunshot wounds in her left side.

31.     On August 6, 2022, I interviewed APD Detective 3, who is assigned to the homicide investigation of the Chinese woman. Detective 3 reviewed video footage from Lutheran Family Services, 230 Truman Street NE, Albuquerque, NM 87108 from July 11, 2022.

10

The video footage showed a dark-colored sedan drive pass the parked vehicle in which the decedent sat. The dark-colored sedan then made a U-turn and stopped approximately six feet away from the decedent. The video footage captured what appeared to be two gunshots directed from the dark-colored sedan into the parked vehicle where the decedent was sitting at approximately 10:00 p.m. The dark-colored sedan then left the area. In an interview with Detective 3 that occurred after the interview in the initial incident report, the decedent's friend, who was present at the time of the homicide, identified the vehicle that she saw leaving the area as a blue or gray dark-colored four-door sedan. Based on Detective 3's training and experience, Detective 3 identified the dark-colored sedan as a Volvo or Volkswagen Jetta with a possible retractable roof.

32.     According to Detective 3, four bullets were found on the scene. Four bullet holes were found in the parked vehicle and were consistent with the decedent's injuries. Two bullets were found in the decedent's body. The other two bullets were found to have penetrated the decedent but had fallen out. Detective 3 identified those two bullets as having originated from a .38 or 9mm cartridge. The decedent's injuries fell within an approximate 3.5-inch shot grouping. According to Detective 3, approximately $8,250 in U.S currency was found in the vehicle with the decedent and had not been touched. In Detective 3's training and experience, the facts mentioned above indicated that this was a targeted shooting by an individual with firearms training.

33.     I noted several apparent similarities between the murder of the decedent and the five shootings previously described. Video footage showed that the vehicle from which the shots appear to have been fired passed by the decedent's vehicle and then doubled back around to fire at the decedent from close range. According to video footage, Victim 5's vehicle appeared to be

followed by what appeared to be the shooter's vehicle. Upon Victim 5 reaching Victim 5's destination, the vehicle in question at first passes by and then returns to the vicinity of Victim 5 before Victim 5 is shot. In my training and experience, the behavior demonstrated in both instances is consistent with a shooter who is working to identify a known target.

34.     Shell casings originating from both 7.62mm and 9mm cartridges were found at the scene of Victim 4. In my training and experience, 7.62mm cartridges are commonly used with rifles or long guns, and 9mm cartridges are commonly used with handguns. In my training and experience, the combined use of a rifle and a handgun indicates a shooter with firearms training who is deliberate in their planning and selection of firearms. The shot grouping that caused the decedent's injuries measured approximately 3.5 inches. In my training and experience, a shot grouping of that nature is indicative of a proficient shooter with firearms training. Based on my training and experience, I believe these fact patterns indicate a shooter who has firearms training.

35.     The Chinese decedent was killed approximately three hundred feet from where Victim 5 was found. The decedent was killed approximately 10 days before Victim 2 was shot, approximately 15 days before Victim 3 was killed, and within a month of when Victim 4 and Victim 5 were killed. In my training and experience, shootings that take place within such geographical and chronological proximity can be related.

36.     According to records obtained from Homeland Security Investigations (HSI), Victim 1's country of birth was Afghanistan.  According to Victim 2's records obtained from U.S. Department of State/Bureau of Consular Affairs, Victim 2's country of birth was Afghanistan.  According to open-source records, approximately 99.7% of the population of Afghanistan follows Islam.

37.     According to records obtained from HSI, Victim 3's country of birth was Pakistan.  According to records obtained from HSI, Victim 4's country of birth was Pakistan. Victim 3 and Victim 4 were given a funeral service at the Islamic Center of New Mexico.

38.     When FBI personnel interviewed Victim 5 on or about September 20, 2021, on an apparently unrelated matter, Victim 5 told FBI personnel that he was from Pakistan.

39.     Based on my training and experience, Victims 1-5 appear to have or would be perceived to have South Asian or Middle Eastern ethnic backgrounds and/or ties to Muslim communities based in Albuquerque. U.S. Census data from 2020 shows that people of solely Asian descent composed approximately three percent of the Albuquerque population. The percentage of the population in Albuquerque that identifies as Muslim is very small.  For example, a 2014 study by Pew Research Center found that less than one percent of adults in New Mexico identified as Muslim.

40.     Ninety five percent of American adults possess a cellular phone, and the substantial majority (seventy-seven percent) possess a "smartphone" (a phone capable of, *inter alia*, connecting to the internet and downloading mobile applications).[1]  Due to the ubiquity of the Google tools and services discussed above (e.g., the free email and map applications, the Android operating system, and the Google tools incorporated by advertisers and publishers into other web services and/or applications) and the fact that Google gathers data both actively and passively (even when the user is not engaged with the device), in my training and experience Google will have gathered data regarding substantial number of the cellular phone users in a particular location at a particular time.

---

[1] http://www.pewinternet.org/fact-sheet/mobile/

41.     Based on the foregoing, I submit that there is probable cause to search information in the possession of Google relating to what devices were in the Target Locations described in Attachment A during the time period described in Attachment A, as well as information that identifies the Google accounts with which those devices are associated, for evidence of the crimes at issue in this case.  Among other things, this information can potentially inculpate or exculpate a user of Google services by showing that he/she was (or was not) near a given location at a time relevant to the criminal investigation.

42.      In order to facilitate the manageable disclosure of and search of this information, the proposed warrant contemplates that Google will disclose the information to the government in stages rather than disclose all of the information for which the government has established probable cause to search at once.  Specifically, as described in Attachment B.I:

    a.  Google will be required to disclose to the government an anonymized list of devices that specifies the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available, of the devices that reported their location within the Target Location described in Attachment A during the time period described in Attachment A.

    b.  The government will then review this list in order to identify devices, if any, that it can determine are not likely to be relevant to the investigation (for example, devices moving through the Target Location in a manner inconsistent with the facts of the underlying case).

    c.  Google will then be required to disclose to the government, at its request, the information identifying the Google account(s) to which remaining devices are associated.

14

## **CONCLUSION**

43.     Based on the forgoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

44.     I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

45.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Robert T. Balint, Special Agent
Federal Bureau of Investigation

Signed electronically and sworn telephonically:     Aug. 7, 2022 1:55 pm

_____

HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

**Property To Be Searched**

This warrant is directed to Google LLC, headquartered at 1600 Amphitheatre Parkway,

Mountain View, California and applies to:

(1) location history data, sourced from methods including GPS, wi-fi, and Bluetooth,

generated from devices and that reported a device location within the geographical

region bounded by the latitudinal and longitudinal coordinates, dates, and times below

("Initial Search Parameters"); and

(2) identifying information for Google Accounts associated with the responsive location

history data.

Initial Search Parameters

1. 11/7/2021, between 6:10 p.m. – 7:10 p.m. (MST)
   a. Target Location: a radius of 300 meters around 35.0913407, -106.5867457

2. 7/21/2022, between 7:00 a.m.-8:00 a.m. (MDT)
   a. Target Location: a radius of 300 meters around 35.0736821, -106.6170724

3. 7/26/2022, between 7:30 p.m. – 8:30 p.m. (MDT)
   a. Target Location: a radius of 300 meters around 35.0808731, -106.5579344

4. 8/1/2022, between 8:50 p.m. – 9:50 p.m. (MDT)
   a. Target Location: a radius of 300 meters around 35.0739762, -106.6194864

5. 8/5/2022, between 1:30pm – 4:30 p.m. (MDT)
   a. Target Location: a radius of 300 meters around 35.0683260, -106.6216778

6. 8/5/2022, between 3:35 p.m. – 4:35 p.m. (MDT)
   a. Target Location: a radius of 300 meters around 35.0815571, -106.5871038

7. 7/11/2022, between 9:30pm-10:30pm (MDT)
   a. Target Location: a radius of 300 meters around 35.0818284, -106.5867011

## ATTACHMENT B

### Items To Be Seized And Searched

**I.      Information to be disclosed by Google**

Google shall provide responsive data (as described in Attachment A) to the government pursuant to the following process:

1.      Google shall query location history data based on the Initial Search Parameters specified in Attachment A.

2.      For each location point recorded within the Initial Search Parameters, Google shall produce to the government anonymized information specifying the corresponding unique device ID, timestamp, coordinates, display radius, and data source, if available (the "Anonymized List").

3.      The government shall review the Anonymized List to remove devices, if any, that it can determine that are likely not relevant to the investigation (for example, devices moving through the Target Location in a manner inconsistent with the facts of the underlying case).

4.      For the remaining device IDs, Google is required to provide to the government upon its request identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Account associated with each identified device ID.

2

**II.      Information to Be Seized**

All information described above in Section I that constitutes evidence of violations of Title

18, United States Code, Section 249 (Hate crime offenses involving actual or perceived race,

color, religion, or national origin) involving unknown person(s).