# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

In the matter of the Search of

INFORMATION THAT IS STORED AT PREMISES       Case No. 22-mr-1161
CONTROLLED BY GOOGLE, 1600 AMPHITHEATRE       **Filed Under Seal**
PARKWAY, MOUNTAINVIEW, CALIFORNIA 94043

## GOOGLE LLC'S MOTION TO QUASH SEARCH WARRANT AND BRIEF IN SUPPORT THEREOF

## I.    INTRODUCTION

This Motion to Quash involves a "geofence" search warrant that directs Google to search the data of every one of its Location History (LH) users and disclose information about any users for whom a stored LH data point falls within one of the seven specified search areas. Each of the search areas is a 300-meter radius around a central point in Albuquerque, New Mexico. The combined search areas encompass over 489 acres of densely populated commercial and residential areas and include, among other things, hundreds of homes, dozens of apartment buildings, and a number of medical offices. They also include several places of worship, including the Islamic Center of New Mexico, searched when more than a thousand people were gathered in mourning and prayer at the funerals of two members of their community. The search periods span between one and three hours for a combined search time of 9 hours. *The search yields nearly 3,100 devices.* The warrant authorizes the Government to obtain subscriber information for all of these devices at its sole discretion and without prior review by the Court and does not limit what the Government may do with the user data it seizes.

The Government's investigation relates to the homicides of four members of the Albuquerque Muslim community. The Government obtained the warrant prior to the arrests of Muhammad Atif Syed, who has now been charged with three of the four homicides and remains

1

the primary suspect in the fourth, and his son, Shaheen Syed. Following Muhammad Syed's arrest, the Government obtained a targeted warrant for his Google Account; the results indicate that no LH data was available for the account—meaning that his device would not be among the thousands of devices responsive to the geofence warrant now before the Court. The Government has not submitted to Google a targeted warrant related to Shaheen Syed.

Upon receiving the geofence warrant, Google worked diligently to identify and preserve responsive data. At the same time, Google expressed its concern to the Government that the warrant appeared to be overbroad and would likely implicate a large number of users unrelated to its investigation, and urged the Government to narrow the search. Before warrant results were available, law enforcement arrested Muhammad Syed.

Despite significant progress in its investigation—progress that may undermine the basis for a geofence search or, alternatively, a search as broad as the warrant before the Court—the Government has declined to withdraw the warrant or to return to the Court to obtain a narrowed warrant that would minimize the impact on thousands of innocent users. Instead, the Government has informed Google that it wishes to proceed with the warrant because it cannot rule out the involvement of other suspects. As to overbreadth, the Government has indicated that it believes a broad search will help it exclude from scrutiny individuals unrelated to the investigation.

The warrant is overbroad, insufficiently particular, and unsupported by probable cause. It is the modern-day equivalent of a general search. The Government's refusal to return to the Court with a revised statement of probable cause to seek an amended, narrowed warrant tailored to the changed circumstances only compounds these issues. The warrant must be quashed.

## II.    BACKGROUND

### A.  Geofence Warrants and Google's Location History Service

#### 1.  Geofence warrants

Search warrants issued to Google typically compel it to disclose stored data pertaining to a particular user's account, including LH data, if requested and available. Geofence warrants take a different approach. Rather than direct Google to disclose the records pertaining to a particular customer or customers, they direct Google to search *all* LH data to identify users whose data suggests their devices were in a given area during a given time frame. The government will then sort through this personal information in an attempt to identify a person of interest. Ex. A, Declaration of Marlo McGriff Regarding Location History ("McGriff Decl.") ¶¶ 14–16.

#### 2.  Google's Location History service

Location History is an optional service, available only to Google Account holders, that is not activated by default. *Id.* ¶ 4. For LH to function—and for the service to store information regarding a user's location—the user must take several steps, including ensuring that the device-level location setting on their mobile device is turned on and enabling LH in their Google Account. *Id.* ¶¶ 7–8. For iOS devices, the user must also configure their device to share location information with applications capable of using that information. *Id.* ¶ 7. As of 2021, only approximately one-third of Google Account holders worldwide had opted in to LH. *Id.* ¶ 12. Of course, for Google to save LH information associated with a particular user, the user must carry the signed-in, powered-on device with them to a particular location. *Id.* ¶ 8.

Users retain control over their LH data. They can pause LH at any time at the account or device level.[1] They can also review and delete their LH, in whole or in part.[2] Users can also choose to have Google *automatically* delete their LH after 3, 18, or 36 months. McGriff Decl. ¶ 10.[3]

## B. The Search Warrant

On Sunday, August 7, 2022, the Government obtained a geofence warrant seeking information about users whose LH indicates their devices may have been within any of seven search areas in Albuquerque during specified search periods. The warrant indicates that the investigation relates to a violation of 18 U.S.C. § 249, hate crime offenses involving actual or perceived race, color, religion, or national origin. *See* Warrant, Attach. B.II. The Government has disclosed that the warrant relates to its investigation into the homicides of four Muslim men in Albuquerque between November 7, 2021, and August 5, 2022. Ex. B, Declaration of Mikella Hurley ("Hurley Decl.") ¶ 2.

*Location 1* is a 300-meter radius around a point (35.0913407, -106.5867457) in the rear parking lot of the Ariana Halal Market & Caffe, 1401 San Mateo Blvd NE, for a period of Sunday, November 7, 2021, between 6:10 p.m. and 7:10 p.m MDT (1 hour). In addition to the market, the search area appears to contain, among other things, a dense residential neighborhood with approximately 170 residential homes, a portion of a major thoroughfare and multiple residential

---

[1] Google, Manage Your Location History, https://support.google.com/accounts/answer/3118687?hl=en (last visited September 7, 2022) ("You can pause Location History at any time in your Google Account's Activity controls.").
[2] Google, Google Maps Timeline, https://support.google.com/maps/answer/6258979?hl=en&co=GENIE.Platform%3DAndroid#zippy=%2Cchange-the-places-that-you-visited-activities-that-youve-done (last visited September 7, 2022) ("If a place is wrong on Timeline, you can edit the location and when you were there.").
[3] *Supra* note 1 (providing instructions for users to enable automatic deletion of LH that is older than 3 months, 18 months, or 36 months). For users who opted in to LH after the summer of 2020, LH is automatically deleted after 18 months by default; users can change that default setting by logging in to their Google Accounts. Sundar Pichai, *Keeping your private information private*, GOOGLE BLOG (June 24, 2020), https://www.blog.google/technology/safety-security/keeping-private-information-private/ ("Starting today, the first time you turn on Location History—which is off by default—your auto-delete option will be set to 18 months by default.").

roads, a church (Crossroads of Albuquerque), and multiple buildings. Upon information and belief, Location 1 is associated with the murder of Mohammad Ahmadi. According to public reports, law enforcement responded to a call regarding a possible shooting at 1401 San Mateo Blvd NE at 6:41 p.m. on November 7, 2021, and found the victim in the rear parking lot of the market.[4]



*Location 2* is a 300-meter radius around a point (central point 35.0736821, -106.6170724) on the intersection of Garfield Avenue SE and Columbia Drive SE, for a period of Thursday, July 21, 2022, between 7:00 a.m. and 8:00 a.m. MDT (1 hour). The search area appears to contain, among other things, a dense residential neighborhood with over 150 residential homes and at least eight apartment complexes, a portion of a thoroughfare and multiple residential roads, Garfield Gospel Chapel, CoDA Social Services Organization, a portion of a cemetery, and Ranchland Hills Golf Club. *See* Ex. C, Screen Shots of Locations 1–7.

---

[4] CITY OF ALBUQUERQUE, 2021 HOMICIDE INVESTIGATIONS, *Mohammad Ahmadi Nov. 7, 2021*, *Information About Homicide Investigations*, https://www.cabq.gov/police/always-remembered/2021-homicide-investigations/mohammad-ahmadi-nov-2-2021 (last visited September 7, 2022).

*Location 3* is a 300-meter radius around a point (35.0808731, -106.5579344) on the driveway leading to 420 Rhode Island St NE, for a period of Tuesday, July 26, 2022, between 7:30 p.m. and 8:30 p.m. MDT (1 hour). The search area appears to contain, among other things, a dense residential area with approximately 200 plots of mixed single- and multi-family homes, a portion of a thoroughfare and multiple residential roads, the Albuquerque Metropolitan Spanish Seventh-Day Adventist Church, and the Mesa Verde Community Center. Upon information and belief, Location 3 is associated with the murder of Aftab Hussein.[5] According to news reports and publicly available filings, on July 26, 2022, law enforcement was dispatched to 417 Rhode Island Street NE following a shotspotter alert; upon arrival, they discovered the victim at 420 Rhode Island Street NE.[6] Publicly available sources provide conflicting information on the timing of the crime, which appears to have occurred at either 8:02 p.m. or 10:02 p.m. MDT.[7] *See* Ex. C.

*Location 4* is a 300-meter radius around a point (35.0739762, -106.6194864) on the sidewalk in front of a home with the address of 422 Cornell Dr SE, for a period of Monday, August 1, 2022, between 8:50 p.m. and 9:50 p.m. (MDT) (1 hour). The search area appears to contain, among other things, a dense residential neighborhood with over 100 homes and at least eight apartment buildings, Garfield Gospel Chapel, part of a cemetery, a brewery, a grocery store parking lot, and portions of two thoroughfares and multiple residential roads. Location 4 significantly overlaps with Location 2. Upon information and belief, Location 4 is associated with the murder of Muhammad Afzaal Hussain. According to news reports and publicly available

---

[5] Elise Kaplan, Funeral Held for Two Muslim Men Whose Killings Police Believe may be Connected, ALBUQUERQUE J., Aug. 5, 2022, https://www.abqjournal.com/2522448/funeral-held-for-two-muslim-men-whose-killing-police-may-be-connected.html.

[6] Ex. D, United States' Motion to Detain at 1–2, United States v. Shaheen Syed, Case No. 22-MJ-1291 JFR (D. N.M. Aug. 12, 2022), ECF No. 12. ("Shaheen Syed Detain Mot.").

[7] *Compare* Ex. D, Shaheen Syed Detain Mot. at 1 (8:02 p.m.), *with* Ex. E, State's Expedited Mot. for Pretrial Detention and to Appear Remotely for Pre-Trial Detention Hearing Due to COVID-19 Public Health Emergency ("State Mot. ISO Detention"), attaching Criminal Complaint - Arrest Warrant Affidavit, at 1 (10:02 p.m.), State of N.M. v. Syed, Case No. T-4-FR-2022-003762 (Bernalillo County D.C. Aug. 10, 2022) ("Muhammad Atif Syed Crim. Compl.").

filings, on August 1, 2022, at 9:17 p.m., law enforcement was dispatched following a 911 call reporting that multiple gunshots had been fired near the area of Cornell Drive SE and Garfield Ave SE. Upon arrival, law enforcement discovered the victim at 422 Cornell Dr SE.[8] *See* Ex. C.

*Location 5* is a 300-meter radius around a point (35.0683260, -106.6216778) on the Islamic Center of New Mexico (ICNM), for a period of Friday, August 5, 2022, between 1:30 p.m. and 4:30 p.m. MDT (3 hours). In addition to the ICNM, the search area appears to contain, among other things, a dense residential area with over 50 homes, at least 30 apartment buildings, a park, two large roadways, and a portion of a University of New Mexico parking lot. Upon information and belief, Location 5 is associated with the funerals of two of the victims, which were held at the ICNM on the afternoon of August 5 and attended by over 1,000 people,[9] including an additional victim and Muhammad Syed.[10]

*Location 6* is a 300-meter radius around a point (35.0815571, -106.5871038) on a commercial building containing the Lutheran Family Services Rocky Mountains and a medical office, 230 Truman St NE, for a period of Friday, August 5, 2022, between 3:35 p.m. and 4:35 p.m. MDT (1 hour). In addition to the commercial building, the search area appears to contain, among other things, a dense residential neighborhood with over 100 homes, the City Presbyterian Church, approximately three medical facilities, various businesses, and a ten-story commercial building. Upon information and belief, Location 6 is associated with the murder of Naeem Hussain. According to news reports and publicly available filings, the victim departed the funeral of two

---

[8] Ex. D, Shaheen Syed Detain Mot. at 2; CITY OF ALBUQUERQUE, 2022 HOMICIDE INVESTIGATIONS, Muhammed Afzaal Hussain (Pakistan), Aug. 1, 2022, https://www.cabq.gov/police/always-remembered/2022-homicide-investigations/muhammed-afzaal-hussain-aug-1-2022.
[9] *Supra* note 5.
[10] Ex. D, Shaheen Syed Detain Mot. at 2–3.

previous victims (covered by Location 5), drove to the Lutheran Family Services, and was shot in his car at 4:04 p.m.[11] *See* Ex. C.

*Location 7* is a 300-meter radius around a point (35.0818284, -106.5867011) on San Mateo Boulevard NE, for a period of Monday, July 11, 2022, between 9:30 p.m. and 10:30 p.m. MDT (1 hour). The search area appears to contain, among other things, a dense residential neighborhood with over 100 homes, the City Presbyterian Church, the Lutheran Family Services Rocky Mountains, approximately three medical facilities, various businesses, and a ten-story commercial building. Location 7 significantly overlaps with Location 6. Upon information and belief, Location 7 is associated with a shooting in Albuquerque.[12] *See* Ex. C.

The warrant directs a search of Google LH data and identifying information for associated Google Accounts. Warrant, Attach. A. It defines "Items to be Seized and Searched" in two parts. *Id.*, Attach. B. *First*, as to "Information to be disclosed by Google," the warrant directs Google to query LH consistent with the search parameters and produce to the Government responsive LH data along with a pseudonymized device identifier. *Id.*, Attach. B.I. The warrant then directs the Government to review the production and "remove devices, if any, that it can determine that are likely not relevant to the investigation (for example, devices moving through the Target Location in a manner inconsistent with the facts of the underlying case)." *Id.* Finally, the warrant requires Google to produce basic subscriber information, as defined in 18 U.S.C. § 2703(c)(2) (BSI), for any devices the Government deems relevant to its investigation. *Id. Second*, as to "Information to Be Seized," the warrant authorizes the Government to seize all information produced by Google

---

[11] Ex. D, Shaheen Syed Detain Mot. at 2–3; CITY OF ALBUQUERQUE, POLICE NEWS, *APD Investigating Overnight Murder; Possibly Linked to Three Other Murders of Muslim Men in Albuquerque*, Aug. 6, 2022, https://www.cabq.gov/police/news/apd-investigating-overnight-murder-possibly-linked-to-three-other-murders-of-muslim-men-in-albuquerque.

[12] Isaac Cruz, *APD: Two Killed in Separate Overnight Shootings*, KRQE NEWS, https://www.krqe.com/news/crime/albuquerque-police-investigate-two-monday-night-shooting-deaths/ (last updated July 19, 2022).

that constitutes evidence of violations of 18 U.S.C. § 249 – described as "Hate crime offenses involving actual or perceived race, color, religion, or national origin involving unknown person(s)." *Id.*, Attach. B.II.

Nearly 3,100 devices were responsive to the search. Google has not produced any records and instead moves to quash the warrant. Google has conferred with the Government, and the Government has indicated it will oppose the present motion.

### C. Google's Correspondence With the Government Regarding the Warrant

The FBI submitted the warrant to Google on Sunday, August 7, and then reached out to Google to request expedited processing, disclosing that the warrant related to multiple homicides of Muslim men in Albuquerque by an individual who was an active threat. Hurley Decl. ¶ 2. Google began identifying and preserving responsive data the following morning. *Id.* ¶ 3. Google's counsel reached out to FBI Special Agent Macmanus to inform him that Google was processing the warrant on an urgent basis, but that due to the size of the request, that processing could take some time. *Id.* Google expressed concerns regarding the scope of the warrant and asked whether the Government would consider a narrowed search or seeking a separate warrant for BSI. *Id.* SA Macmanus indicated that he was unwilling to narrow the search and that it was unlikely the Government would agree to obtain a separate warrant for BSI, but assured Google that the FBI's internal tools would allow him to exclude devices unrelated to the investigation from the Government's scrutiny. *Id.*

On August 9, news outlets reported that a suspect had been arrested. According to charging documents, Muhammad Syed was arrested just before midnight on August 8.[13] Also on August 9,

---

[13] According to the Criminal Complaint, law enforcement searched Muhammad Syed's home on August 9, 2022, and found two weapons that were later confirmed to be a presumptive match to the weapons used for two of the homicides. Ex. E, Muhammad Atif Syed Crim. Compl. at 4–5. To date, Muhammad Syed has been indicted on charges related to the murder of three victims, and, upon information and belief, remains the primary suspect for the murder of a fourth victim, Mohammad Ahmadi. Ex. F, Grand Jury Indictment, State of N.M. v. Syed, Case No. D-202-CR-2022-01868

Google completed processing the warrant. *Id.* ¶ 4. Google's counsel called SA Macmanus to communicate that the warrant had swept in thousands of users and renewed Google's concerns about the warrant's overbreadth. *Id.* Google's counsel offered to expedite processing of any targeted legal process for the suspect's account or the accounts of any other individuals under investigation, and discussed with SA Macmanus that targeted legal process could avoid the constitutional issues raised by the geofence warrant. *Id.* SA Macmanus indicated that he would confirm the Government's position on the geofence warrant and acknowledged that Google would not take further action on the warrant in the meantime. *Id.* Later that evening, SA Macmanus confirmed that the AUSA and FBI management were in agreement that the Government would pursue the warrant because it believed co-conspirators may have been involved in the crimes under investigation. *Id.* ¶¶ 5, 7.

On August 10, the Government submitted a warrant to Google for an account that it identified as belonging to its "primary suspect," Muhammad Syed. Hurley Decl. ¶ 9. Google produced responsive records that evening. *Id.* The results indicate that no LH data was available for the account—*meaning that Muhammad Syed's device would not have been one of the nearly 3,100 devices responsive to the geofence warrant. Id.* On August 11, Google's counsel spoke with Assistant U.S. Attorney Kim Brawley ("AUSA Brawley"). *Id.* ¶ 10. Google explained its serious concerns regarding the warrant's overbreadth, disclosed that the search yielded thousands of devices, and explained that because the suspect's account did not return LH data, he would not have been identified by the geofence warrant. *Id.* AUSA Brawley explained that the Government had obtained the geofence warrant when it had no investigative leads, but that the Government and

---

(Bernalillo County D.C. Aug. 22, 2022) ("Muhammad Syed Grand Jury Indictment"). The Government filed a criminal complaint against Muhammad Syed's son, Shaheen Syed, on August 9 and later moved to detain Shaheen Syed, detailing his potential involvement in the homicides along with evidence indicating he was with his father and near the scene of Naeem Hussain's murder on August 5. Ex. D, Shaheen Syed Detain Mot.

State had since made substantial investigative gains, including identifying Muhammad Syed as the primary suspect and arresting him,[14] identifying his son as an additional suspect and charging him in weapons-related crimes, and gathering substantial physical and digital evidence—including data from Muhammad Syed's Google Account. *Id.* AUSA Brawley said she hoped the geofence warrant would be "moot" by early the following week and suggested that Google and the Government put the warrant "on the backburner" until August 16. *Id.*

AUSA Brawley next contacted Google on August 19 to indicate that the Government would not withdraw the geofence warrant. *Id.* ¶ 11. During a later call, AUSA Brawley explained that the Government wanted the geofence warrant results because it could not yet rule out the possibility that other perpetrators may have been involved. *Id.* She explained that the Government believed that the breadth of the search areas would help it determine which devices were *unrelated* to the investigation. *Id.* She also stated that the Government was working to obtain additional targeted legal process for Shaheen Syed and other family members, and Google again offered to expedite the same. *Id.* To date, Google is unaware of the Government having submitted any targeted legal process related to Shaheen Syed or any additional family members or suspects. *Id.* ¶ 12.

### III.    ARGUMENT

The Fourth Amendment limits government power and protects individual privacy. It provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[14] Muhammad Syed had been charged with two of the homicides by the time of this conversation. Ex. E, State Mot. ISO Detention.

U.S. CONST. amend. IV. Its "basic purpose" is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citation omitted). It is well established that "any intrusion in the way of search or seizure is an evil, so that no intrusion at all is justified without a careful prior determination of necessity." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), *holding modified by Horton v. California*, 496 U.S. 128 (1990). The warrant requirement protects against this evil by prohibiting searches not based upon probable cause and requiring the warrant to describe with particularity the place to be searched and the items to be seized, thus preventing the government from conducting "a general, exploratory rummaging in a person's belongings." *Id.*

Yet the warrant here would allow the Government to engage in a modern-day exploratory rummaging in data reflecting the detailed location and movements of *thousands* of individuals. The search intrudes upon people's most intimate and protected private places—their homes and their devices. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001); *Riley v. California*, 573 U.S. 373, 395 (2014). The wide net cast by the Government would provide information about LH users spending time in highly sensitive, personal, and potentially confidential spaces, including homes, places of worship, and medical offices.

The Court should quash the warrant for at least three independent and sufficient reasons. First, the warrant is overbroad and lacks particularity. Second, the warrant, which grants the Government unfettered discretion to determine which data to seize, violates the Fourth Amendment's prohibition on general searches. Third, the warrant is unsupported by probable cause, particularly because circumstances have evolved since its issuance.

## A. The Warrant Is Overbroad and Lacks Particularity

### 1. The Warrant is Overbroad

The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The "manifest purpose" of the particularity requirement is to prevent general searches. *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). The authorization to search is thereby limited "to the specific areas and things for which there is probable cause to search," thus ensuring that the search "will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Id.*; *Carpenter*, 138 S. Ct. at 2213; *Coolidge*, 403 U.S. at 467 ("[T]hose searches deemed necessary should be as limited as possible."). Consequently, a warrant with an "indiscriminate sweep" is "constitutionally intolerable." *Stanford v. Texas*, 379 U.S. 476, 486 (1965).[15]

But the warrant before the Court would authorize the Government to engage in an exploratory search to identify all users whose LH indicates their device may have been within one of seven 300-meter-radius search areas, comprising nearly 500 acres of densely populated mixed residential and commercial areas. The warrant permits the Government to indiscriminately seize all data responsive to the broad search and sift through that data "to see if evidence exists." DOJ White Paper at 8. The warrant then authorizes the Government, at its sole discretion, to direct Google to disclose the Google Account information for any of the nearly 3,100 devices it deems relevant to the investigation, and places no limits on what the Government may do with the data seized. The warrant is, therefore, overbroad. *Cf. People v. Gutierrez*, 222 P.3d 925, 940 (Colo.

---

[15] The Department of Justice has recently emphasized its adherence to these requirements. Describing the requirements for obtaining a warrant for electronic communications as "perhaps the toughest in the world" and "highly protective of individual privacy," the Government highlighted that all such warrants "must describe with particularity the data to be searched and seized; fishing expeditions to see if evidence exists are not permitted." U.S. DEP'T OF JUST., WHITE PAPER, PROMOTING PUB. SAFETY, PRIV., & THE RULE OF LAW AROUND THE WORLD: THE PURPOSE AND IMPACT OF THE CLOUD ACT (Apr. 2019), at 8, https://www.justice.gov/opa/press-release/file/1153446/download (hereinafter "DOJ White Paper").

2009) (warrant authorizing seizure of all tax returns for two-year period from a tax service business was invalid where the supporting affidavit merely speculated that some of the business's 5,000 clients had committed, or were committing, crimes); *United States v. Abrams*, 615 F.2d 541, 545 (1st Cir. 1980) (Medicare fraud warrant that authorized "an indiscriminate seizure" of records from three doctor's offices was invalid); *United States v. Ellis*, 971 F.2d 701, 706 n.7 (11th Cir. 1992) (a general search is one that creates a "danger of invading the privacy of a person under no suspicion at all, or of searching an entire neighborhood").

While Google has not reviewed the affidavit underlying the warrant, Locations 1, 3, 4, and 6 appear to be centered upon the locations of the murders of four members of the Albuquerque Muslim community. Location 5 appears to be centered upon the funerals of two of those victims, which were attended by more than a thousand people, including Muhammad Syed, who is suspected to have followed an additional victim from the funeral to the center point of Location 6, where he shot and killed the victim.[16] Muhammad Syed has been charged with the homicides that occurred in Locations 3, 4, and 6, and is the primary suspect of the homicide that occurred in Location 1.[17] His son, Shaheen Syed, is in custody and is also a suspect in the homicides.[18] The State and Government have gathered a significant amount of evidence about the homicides through, among other things, a search of the Syeds' shared home, their vehicle, devices, and cell site location information.[19] State and Government filings indicate that at least three of the four shootings were conducted at short range at the center of Locations 3, 4, and 6 respectively, strongly suggesting that if the Government can establish a reasonable basis to believe that evidence of the

---

[16] Ex. D, Shaheen Syed Detain Mot. at 2–3.
[17] Ex. F, Muhammad Syed Grand Jury Indictment.
[18] Ex. D, Shaheen Syed Detain Mot. at 1.
[19] *Id.* at 4–7.

crime will be found in Location History at all, a search that extends more than three football fields in every direction from each location is substantially overbroad.[20]

The Government is aware that the search sweeps in thousands of devices and has informed Google that it *deliberately* drew broad search areas because it believes that collecting a large amount of data will help it to more accurately identify individuals who are *unrelated* to the crimes. *Id.* ¶ 11. The warrant authorizes the Government to seize the LH and identifying information of individuals who may have been, among other things: enjoying the privacy of their homes (Locations 1–7); engaging in religious activities at a place of worship (Locations 1–7); attending a funeral (Location 5); visiting a loved one's grave (Location 2); or attending a doctor's appointment (Location 6). The Government contends that it must obtain the private information of these and thousands of other individuals through its dragnet to exclude them from suspicion. But this is precisely the kind of indiscriminate sweep the Fourth Amendment was designed to prohibit. The fact that all seven searches are uniform, 300-meter-radius circles—*each* comprising an area *greater than 52 football fields*—indicates that the Government has failed to "ensure that the search[es] [are] confined in scope" to those areas the Government has established probable cause to search.[21] *Cassady v. Goering*, 567 F.3d 628, 636 (10th Cir. 2009) (warrant overbroad where it contained no limit on the scope of the search and was "not as particular as the circumstances would allow or require" (internal quotation marks and citations omitted)).

Geofence case law strongly supports the conclusion that the warrant is overbroad. Google is aware of seven published opinions addressing the lawfulness of geofence warrants. Most

---

[20] For example, the Government believes that the suspect was hiding in a bush near the area where the victim was shot in Location 3. *Id.* at 2. Similarly, the Government has described the shooting at the center of Location 4 as a drive-by shooting. *Id.* And surveillance footage of the crime scene at Location 6 shows the victim was followed into a parking lot by a light-colored sedan and shot shortly thereafter. *Id.* at 3.

[21] The search periods for six of the seven searches are one hour, suggesting that the search periods were also drawn without regard to the unique circumstances justifying the search at each of those locations.

recently, the U.S. District Court for the Eastern District of Virginia addressed a motion to suppress a geofence warrant. *United States v. Chatrie*, No. 3:19cr130, 2022 WL 628905, at *11 (E.D. Va. Mar. 3, 2022). The warrant was issued in a bank robbery investigation and authorized a single search of a 150-meter radius geofence "in an urban environment." *Id.* The search area included a bank and a church, and the search period spanned an hour during the time of the robbery. *Id.* The search yielded 19 responsive devices. *Id.* at *13. The court held the warrant invalid because it was unsupported by probable cause, lacked particularity, and was overbroad. The court noted that "it [was] difficult to overstate the breadth of [the] warrant, particularly in light of the narrowness of the Government's probable cause showing," which relied largely on the mere fact that "the perpetrator 'had a cell phone in his right hand and appeared to be speaking with someone on the device.'" *Id.* at *21. The court declined to suppress the geofence records under the good faith exception, but it "strongly caution[ed] that this exception may not carry the day in the future." *Id.* at *30.

The remaining six published geofence opinions address the government's application for issuance of a geofence warrant. Of the six, four courts rejected the government's application on the basis that the proposed search lacked probable cause and particularity and was overbroad. *See, e.g.*, *In re Search of Info. that is Stored at the Premises Controlled by Google LLC* ("*D. Kansas Geofence Warrant*"), 542 F. Supp. 3d 1153, 1158 (D. Kan. 2021) (denying warrant application for lack of probable cause and concerns over particularity and overbreadth, including that "the geofence boundary appears to potentially include the data for cell phone users having nothing to do with the alleged criminal activity"); *In re Search of Info. Stored at Premises Controlled by Google* ("*Pharma II*"), 481 F. Supp. 3d 730, 756 (N.D. Ill. 2020) (denying application for lack of probable cause and particularity and overbreadth, and holding that particularity is lacking where

the government is permitted "to sort through" results "to identify the suspect by process of elimination"); *In re Search of Info. Stored at Premises Controlled by Google* ("*Pharma I*"), No. 20 M 297, 2020 WL 5491763, at *1 (N.D. Ill. July 8, 2020) (denying application for overbreadth and lack of particularity where the government sought data related to geofences in densely populated areas for 45-minute intervals); *In re Search of Info. Stored at the Premises Controlled by Google* ("*Virginia Hotel Geofence Warrant*"), No. KM-2022-79, 2022 Va. Cir. LEXIS 12* (Va. Cir. Ct. Feb. 24, 2022) (denying application for lack of probable cause and particularity and overbreadth where the government sought data related to geofences over a motel and adjoining spaces).

The two courts that have issued written opinions granting geofence warrant applications did so only where the geofences and search periods were tailored to strictly minimize impact on individuals unrelated to the criminal activity. The first granted the government's application where the six geofences were narrowly "constructed to focus on the arson sites and the streets leading to and from those sites" and where target time periods, which totaled 24 minutes, 17 minutes, 15 minutes, 16 minutes, 37 minutes, and 31 minutes, were "in the early hours of the morning when [the subject] commercial businesses [were] usually closed and unoccupied" such that "location data from uninvolved individuals [would] be minimized." *In re Search Warrant Application for Geofence Location Data Stored at Google Concerning an Arson Investigation* ("*Arson*"), 497 F. Supp. 3d 345, 358 (N.D. Ill. 2020). The government provided the court with detailed information from interviews and video surveillance to show that "the scope of the warrant would not result in the collection of a broad sweep of data from uninvolved individuals for which there is no probable cause." *Id.* at 359. In granting the application, the court acknowledged that, because geofence warrants target *locations* and not *individuals*, "it is easy for a geofence warrant, if cast too broadly,

to cross the threshold into unconstitutionality because of a lack of probable cause and particularity, and overbreadth concerns under Fourth Amendment jurisprudence." *Id.* at 353.

The second granted the government's application where the search was cabined to narrowly drawn locations and times the government knew the suspects to be based on CCTV footage that showed the suspects speaking on cell phones. *Matter of Search of Info. Stored at Premises Controlled by Google LLC* ("*DDC Geofence Warrant*"), No. 21-SC-3217, 2021 WL 6196136, at *5, *13 (D.D.C. Dec. 30, 2021). CCTV footage indicated that the suspects were either alone in the geofences during the search periods or, at most, two to three other individuals were in the geofence with the suspects. *Id.* The eight search periods authorized by the warrant ranged from 2 to 27 minutes each. *Id.*[22]

In stark contrast to the warrants approved by the *Arson* and *DDC Geofence Warrant* courts, the search areas in the present warrant are not tailored to exclude unrelated individuals. The warrant is significantly broader than the warrant held to be invalid in *Chatrie*, which involved a one-hour search of a 150-meter radius geofence that included a bank and a church. It is also significantly broader than geofence warrant applications rejected by other courts on Fourth Amendment grounds:

| Matter | Total Search Area | Total Search Period | Holding |
|---|---|---|---|
| *Chatrie* | 17.5 acres in an urban environment. | 1 hour | Unconstitutional |

---

[22] These cases incorrectly conclude based on inaccurate factual statements in the government's supporting affidavits that, given the pervasiveness of cell phones and of the Android operating system and Google mobile applications, it is likely that evidence of the crime—namely, the suspect's identity—will be found within data responsive to a geofence search. But, as detailed above in Background, section II(A)(2), LH is not synonymous with device-level location services on either Android or iOS or Google applications, such as Google Maps. It is, therefore, *not* the case that most individuals within the geofence will be identified by a geofence search.

| Matter | Total Search Area | Total Search Period | Holding |
|---|---|---|---|
| *Virginia Hotel Geofence Warrant* | Almost the entirety of a motel's property, including the motel, its parking lots, and adjoining property owned by the motel. | Nearly 3 hours | Unconstitutional |
| *D. Kansas Geofence Warrant* | A "sizeable business establishment." | 1 hour | Unconstitutional |
| *Pharma I* | Two 100-meter radius geofences, covering over 15 acres of land, which included medical offices, a large residential complex, restaurants, and various businesses. The warrant application proposed two separate search periods for the second geofence. | 2 hours and 15 minutes | Unconstitutional |
| *Pharma II* | Two polygons, each drawn over a separate business, which included residential units above one of the businesses, a sidewalk, a portion of the streets on which the businesses were situated, and the adjacent parking lot. The warrant application proposed two separate search periods for the second location. | 2 hours and 15 minutes | Unconstitutional |
| *Arson* | Four geofences carefully constructed to focus on the arson sites and the streets leading to and from them, and to exclude residences and other commercial buildings. Two of the four geofences included two search periods. | 2 hours and 19 minutes in a commercial area in the early morning | Warrant application granted |
| *DDC Geofence Warrant* | 0.20 acres (or 875 square meters), which included the front half of a business and its parking lot, searched for eight separate search periods. | 3 hours and 5 minutes | Warrant application granted |
| *The Subject Warrant* | Seven 300-meter-radius geofences covering more than 489 acres of densely populated residential and commercial areas, and including hundreds of homes, a number of places of worship, including the ICNM (when over 1,000 individuals were gathered in mourning and/or worship) and a | 9 hours | |

| Matter | Total Search Area | Total Search Period | Holding |
|--------|-------------------|---------------------|---------|
| | number of churches, doctors' offices, busy roadways, and numerous businesses. | | |

The warrant, which would reveal to the Government the location and identity of nearly 3,100 "private citizens who [have] no reason to incur Government scrutiny," is overbroad, lacks particularity, and must be quashed. *Chatrie*, 2022 WL 628905, at *21.

> 2. *Because the Warrant Infringes Upon the Free Exercise of Religion, the Court Must Review It with "Scrupulous Exactitude."*

The search areas cover several places of worship including the Islamic Center of New Mexico. The warrant directs Google to search LH for devices present when more than 1,000 people were gathered at religious funeral services for two of the victims. The Government focused Location 5 on the ICNM apparently to identify individuals who attended the funeral services. By seeking to identify and collect information of users who were practicing their faith, the warrant infringes upon the free exercise of religion and the "corresponding right to associate with others" in furtherance of "social . . . religious, and cultural ends." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021). These rights are at the core of the First Amendment's free exercise clause. *See, e.g.*, *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) ("[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment.").

Where, as here, a warrant targets activities protected by the First Amendment, the Fourth Amendment's particularity requirement must be applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas*, 379 U.S. 476, 485 (1965)). Otherwise, the "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus v. Search Warrants*, 367 U.S. 717, 729 (1961); *see also United*

*States v. Jones*, 565 U.S. 400, 416 (observing that "[a]wareness that the government may be watching chills associational and expressive freedoms," and "the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse") (Sotomayor, J., concurring).

The significant First Amendment activities impacted by the Government's search require that the Fourth Amendment's prohibition on overbroad searches be applied to the warrant with careful precision. The warrant does not meet these demands.[23]

### B. The Warrant Grants Law Enforcement the Unbridled Discretion Associated with Prohibited General Searches

To safeguard against general searches, the Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. A warrant is sufficiently particular when, "[a]s to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196 (1927). The particularity requirement is especially critical in the context of a digital search because the government's ease of access to vast amounts of personal data increases the risk that it may conduct wide-ranging searches into individuals' private affairs. *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009). That is certainly the case here.

The warrant requires Google to produce de-identified device information for devices responsive to the search. It then authorizes the Government, with no judicial oversight and based on its unilateral determination that certain devices and associated accounts are "relevant to the investigation," to require Google to produce identifying information regarding those accounts.

---

[23] There is not space within this motion for Google to fully address the implications of the Government's targeted search of the ICNM during a religious service, and Google is imperfectly positioned to do so. If the Court is concerned about this important issue, then Google requests that it allow amici to participate who can provide unique perspective on these issues.

Warrant, Attach. B.I. The warrant therefore grants the Government *unbridled discretion* to seek basic subscriber information for any or all of the nearly 3,100 devices responsive to the search. It contains no limiting principles or "objective guardrails by which officers could determine which accounts would be subject to further scrutiny." *Chatrie*, 2022 WL 628905, at *25 (emphasis omitted); *see also Pharma II*, 481 F. Supp. 3d at 754 (invalidating geofence warrant that "put[] no limit on the government's discretion to select the device IDs from which it may then derive identifying subscriber information from among the anonymized list of Google-connected devices that traversed the geofences").[24] The warrant, therefore, does not properly safeguard against exploratory rummaging prohibited by the Fourth Amendment, and should be quashed.

### C. The Warrant Lacks Probable Cause

#### 1. Changed Circumstances Undermine Probable Cause

The circumstances of the Government's investigation have changed substantially since it obtained the warrant—as has its understanding of the number of innocent individuals affected by the search—and yet the search has not. Changed circumstances between when a warrant is authorized and when it is executed may undermine probable cause. *See United States v. Tenerelli*, 614 F.3d 764, 770 (8th Cir. 2010) (fruits of a valid warrant can be suppressed upon a finding of sufficient "changed circumstances between when the warrant was authorized and when it was executed"); *United States v. Williams*, 10 F.3d 590, 595 (8th Cir. 1993) (same, noting that "[r]ather than speculate whether probable cause continued to exist, the better practice is to return to court

---

[24] The warrant is also insufficiently particular because it defines the items to be seized as evidence of violations of 18 U.S.C. § 249 – described as "Hate crime offenses involving actual or perceived race, color, religion, or national origin involving unknown person(s)." Warrant, Attachment B.II ("Information to Be Seized"). The warrant does not specify any features or limiting principles to inform the Government *how* to differentiate devices considered "evidence" of the crime from the thousands of other devices responsive to the search. *See, e.g., United States v. Leary*, 846 F.2d 592, 601–02 (10th Cir. 1988) (warrant invalid where it broadly permitted seizure of documents relating to "the purchase, sale and illegal exportation of materials in violation of the federal export laws," and citing cases supporting the conclusion that "reference to a broad federal statute is not a sufficient limitation on a search warrant").

and update the information and obtain a new warrant"); *see also United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984) (the government has a duty to report new or correcting information to the court when such information is material to the court's probable cause determination).

When law enforcement served the warrant on Google on August 7, law enforcement had no investigative leads and had not yet identified a suspect. Hurley Dec. ¶ 10. By the time the Google had processed the warrant, Muhammad Syed had been arrested and identified by news outlets as the primary suspect. Since then, Muhammad Syed has been charged with three out of the four homicides and his son, Shaheen Syed, has been charged with other crimes and detained and identified as an additional suspect. The Government and the State have gathered significant additional evidence about the crimes and the suspects, including, for example, through a search of the suspects' home, vehicle, phones, and cell site location information, and through analysis of available physical evidence, including weapons found in the home and shell casings.[25]

The Government has indicated that it intends to obtain targeted legal process for Shaheen Syed's Google Account, if any, and that it is investigating additional members of the Syed family and may obtain targeted legal process for their accounts as well. Moreover, the Government now knows that no LH data was available for Muhammad Syed's account, meaning that his account would not have been identified through the geofence warrant before the Court. Hurley Dec. ¶ 10. To the extent the Government's affidavit supporting the warrant provided a basis to believe that the suspect was likely a Google Account holder who had enabled Location History and, therefore, would have been identified in the search results, it is now clear that these statements would have been incorrect with respect to Muhammad Syed. The Government has informed Google that it has

---

[25] Ex. D, Shaheen Syed Detain Mot. at 4–7.

not yet submitted a warrant for Shaheen Syed's Google Account, if any, but the results of any such warrant would establish whether his account contains relevant LH data—and would do so without implicating thousands of additional Google users.

The warrant's constitutional infirmities are compounded by the fact that the Government continues to demand the data of thousands of Google users despite these significantly changed circumstances and developments in its investigation. The Government claims that the legal basis for its search of thousands of Google users—many of whom may have been hundreds of meters away from any relevant criminal activity—was valid when the warrant was issued and remains valid today because the Government cannot rule out the possibility that additional suspects may have been involved. *Id.* ¶ 11. Because the Government appears to have very little information about these additional suspects—including whether they exist—it is unlikely that it can provide a reasonable basis to believe that it will find evidence of their identities in a search of LH. *See* Section C.2, *infra* (explaining that to establish a reasonable basis to believe that evidence of a crime will be found in LH, the Government must be able to establish a reasonable basis to believe the suspect is a LH user). And permitting the Government to engage in a wide-ranging search to rule out the possibility that evidence *could* exist in a place would turn the Fourth Amendment on its head. Regardless, the Fourth Amendment vests the *Court*—not the Government—with authority to determine whether a geofence search is appropriate in light of these significantly changed material circumstances, and, if so, the appropriate scope of that search.

2. *It is Highly Unlikely the Government Has Established Probable Cause To Search Google Location History*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV. The probable cause standard is objective and requires the Government to present facts that "would warrant a person of reasonable caution in the belief that contraband or

evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (cleaned up). While probable cause does not require certainty, mere belief and speculation is not sufficient. *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

To establish probable cause to believe that evidence of the crime will be found in LH, the Government must present a sufficient basis for a person of reasonable caution to believe all of the following: (1) The suspect is a cell phone user; (2) The suspect had a cell phone on their person while located within the geofences during the search periods; (3) The suspect is also a Google Account holder; (4) The suspect is one of the approximately ⅓ of Google Account holders worldwide who has also opted in to Google's LH service; (5) The suspect had powered the device on; *and* (6) The suspect had signed in to their Google Account on that device.

Assuming the Government does not have direct evidence establishing each of these conditions, then it is the compound probability that *all* of these conditions have been fulfilled—not just that *any one* of them has—that must establish probable cause. Critically, statistics regarding the prevalence of cell phones—among the general population or among individuals engaged in criminal activities—coupled with statistics regarding the prevalence of the Android, iOS, and Google's mobile applications, such as Google Maps, are insufficient to establish probable cause to search LH.[26]

Indeed, the Government now knows that no LH data was available for the primary suspect's Google Account, which means that the account would not have been identified through

---

[26] LH is not synonymous with device-level location services on either Android or iOS or with Google mobile applications. It is therefore *not* the case, for example, that an individual who has merely signed in to a Google Account or used a Google application on their device will save LH to their account. Nor is it the case that an individual who merely engages with a Google application on their device, such as allowing Google Maps to access their location and navigating via Google Maps, will concurrently save LH to their account. LH may be saved in those circumstances—but only when the user has also taken the requisite steps to enable LH to be collected from the relevant device. *See* Background, Section I.B, *supra*. Additionally, it is worth emphasizing, for the avoidance of doubt, that written opinions addressing geofence warrants have inaccurately described the nature of LH and have based their probable cause analyses on inaccurate facts. *See* note 22, *supra*.

the present geofence warrant. And to the extent the Government knows nothing about potential additional suspects involved in the criminal activity under investigation—but rather, seeks to rule out that others *could* be involved—it is difficult to imagine it can present a reasonable basis to believe that evidence will be found in LH.

### 3. Mere Proximity to a Crime is Insufficient to Establish Probable Cause.

Finally, probable cause cannot be established by mere proximity to a crime. *See Ybarra v. Illinois*, 444 U.S. 85, 86 (1979) (warrant authorizing search of tavern and bartender for narcotics did not extend to patrons); *Pharma II*, 481 F. Supp. 3d at 753 (rejecting geofence warrant application that would have granted the government discretion to search for users who "traversed the geofences" based solely on those users' propinquity to the suspected criminal activity).

Even if proximity were a sufficient basis for probable cause, because the search areas are so large, many, if not most, of the nearly 3,100 responsive devices will not have been proximate to the suspected criminal activity. *See, e.g.*, *Chatrie*, 2022 WL 628905, at *21 (geofence warrant did not meet Fourth Amendment reasonableness standard where the geofence was so large that it swept in users who may not have been "*remotely* close" to the crime scene).

## IV. CONCLUSION

For the reasons set forth above, Google respectfully requests that the warrant be quashed in its entirety.

WIGGINS, WILLIAMS & WIGGINS
A Professional Corporation

Electronically Filed

By___*/s/ Lorna M. Wiggins*_____
      Lorna M. Wiggins
1803 Rio Grande Blvd., N.W. (87104)
P.O. Box 1308
Albuquerque, New Mexico 87103-1308
(505) 764-8400
lwiggins@wwwlaw.us

Hayley L. Berlin
HBerlin@perkinscoie.com
*Pro hac vice pending*
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000


Andrew S. Pak
APak@perkinscoie.com
*Pro hac vice pending*
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
Telephone: 212.262.6900
Facsimile: 212.977.1649

*Attorneys for Google LLC*

We hereby certify that a copy
of the foregoing and associated
exhibits were emailed to Kimberly Brawley
at kimberly.brawley@usdoj.gov
on this 7th day of September, 2022.

WIGGINS, WILLIAMS & WIGGINS, P.C.


By____*/s/ Lorna M. Wiggins*_____
       Lorna M. Wiggins

# EXHIBIT A

# DECLARATION OF MARLO MCGRIFF REGARDING LOCATION HISTORY

1.     I am a Location History Product Manager at Google, where my responsibilities include the Location History product. I joined Google in 2011 and have been in my current role since 2016.

2.     I lead the cross-functional Location History team and am the overall Location History lead, setting the near-term goals and long-term strategy for the product.

## I.   Google Location History

3.     Some Google services require a user to have a Google Account before they can use the service at all, like Gmail. Other services do not require a user to have an account, but offer additional functionality that is only available to Google Account holders, like Maps and Search.

4.     Google Location History ("LH") is a service that Google Account holders may choose to use to build a personal Timeline to help them keep track of locations they have visited while in possession of their compatible mobile devices. LH is not available to users who do not have a Google Account. The service is only available for Account holders who explicitly opt into it.

5.     Google Account holders can visualize their LH data in their Timeline, which also allows them to edit and control the record of their travels, as in a journal of their place visits (e.g., visit to a ski resort), activities (e.g., driving), and paths between place visits (e.g., driving from hotel to ski resort). Through Timeline, an Account holder can see where and when over a given period they have traveled with their mobile device.

6.     Account holders who opt into and use LH can access other benefits on their Google devices or applications as well. For instance, they can obtain personalized content or recommendations based on places they have visited.

7.     For LH to function and save information about an Account holder's location, the Account holder must take several steps. First, they must ensure that the device-level location setting on their mobile device is turned on. When the device-location setting is activated, the mobile device automatically detects its own location, which the device ascertains based on GPS signals, Wi-Fi connections, and/or cellular networks. On iOS devices, they must further configure their mobile device to share location information by granting the required device-level application location permission.

8.     Second, the Account holder must opt into LH at the account level. And to actually record and save LH data about where the Account holder has traveled with their mobile device, they must travel with that device while the device is signed into the Google Account.

9.     When an Account holder takes the above-mentioned steps, the resulting data is communicated to Google for processing and storage. Google maintains this data in a database that houses only LH information.

10.    LH users can delete some or all LH information. Since the spring of 2019 they can also enable a setting to automatically delete LH that is older than 3, 18, or 36 months.

11.    GPS or Wi-Fi-sourced LH information may be considerably more precise than other kinds of location data, including cell-site location information ("CSLI"). That is because, as a technological matter, a mobile device's location-reporting feature can use multiple inputs in estimating the device's location. Those inputs could include GPS signals (i.e., radio waves detected by a receiver in the mobile device from orbiting geolocation satellites) or signals from nearby Wi-Fi networks in addition to cell towers. These inputs (when the Account holder enables them) can be capable of estimating a device's location to a higher degree of accuracy and

precision than is typical of CSLI. For example, I understand that when a strong GPS signal is available, a device's location can be estimated within approximately twenty meters or less.

12.    In 2021, the majority of Google Account holders worldwide did not have LH enabled on their account. While a more precise percentage is difficult to calculate in part due to fluctuating numbers of users, in 2021, roughly one-third of active Google Account holders (i.e., numerous tens of millions of Google users) had LH enabled on their accounts.

13.    Google also has other types of location data, including in Web & App Activity ("WAA") and Google Location Accuracy ("GLA").

## II.    Google's Production of LH Information to Law Enforcement

14.    A so-called "geofence" warrant seeks LH information for all Google Account holders whose LH information indicates that their device may have been present in a specified geographic area during a certain window of time.

15.    In practice, LH is the only form of location data Google maintains that Google believes to be responsive to a geofence request. In particular, even though Google devices and applications might sometimes use or transmit WAA or GLA information about a user's location to Google while the device or application is in use, neither WAA nor GLA data have the ability to place a user in a sufficiently precise location at a sufficiently precise time in a way that is responsive to a geofence request.

16.    To conduct a search in response to a geofence request, Google must search across all LH data to identify Account holders with LH data during the relevant timeframe and run a computation against every set of stored LH coordinates to determine which records match the geographic parameters in the warrant. Google does not know which Account holders may have such saved LH data before conducting the search and running the computations.

17.     The location data points reflected in LH are estimates based on multiple inputs, and therefore an Account holder's actual location does not necessarily align perfectly with any one isolated LH data point. Each set of coordinates saved to a user's LH includes a value, measured in meters, that reflects Google's confidence in the saved coordinates. A value of 100 meters, for example, reflects Google's estimation that the Account holder's device was likely located within a 100-meter radius of the saved coordinates based on a goal to generate a location radius that accurately captures roughly 68% of users. In other words, Google's goal is that there will be an estimated 68% chance that the Account holder's device was actually located anywhere within the 100-meter radius of the saved coordinates.[1]

18.     If an Account holder's estimated location (i.e., the stored coordinates in LH) falls within the geographic area defined by the geofence warrant, that location report is responsive to the warrant even if the 68% confidence interval associated with the location report falls partly outside the area defined in the warrant. As a result, it is possible that, when Google is compelled to return data in response to a geofence warrant, some of the Account holders whose locations are estimated to be within the geographic area defined in the warrant (and whose data is therefore included in a data production) were in fact located outside the geographic area. To provide information about that, Google includes in the production to the government a radius (expressed as a value in meters) around an Account holder's estimated location that shows the range of location points around the stored LH coordinates that are believed to contain, with 68% probability, the user's actual location.

---

[1] While Location History is not the same as Google Maps, the blue dot that a user sees in Google Maps indicating Google's estimate of their location similarly reflects Google's goal is that there will be an estimated 68% chance that the user's device is actually located within the shaded circle surrounding the blue dot.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 9th day of Aug, 2022, in Mountain View, CA.

_____
Marlo McGriff

# EXHIBIT B

In the matter of the Search of

INFORMATION THAT IS STORED AT PREMISES      Case No. 22-mr-1161
CONTROLLED BY GOOGLE, 1600 AMPHITHEATRE      **<u>Filed Under Seal</u>**
PARKWAY, MOUNTAINVIEW, CALIFORNIA 94043

## <u>DECLARATION OF MIKELLA HURLEY IN SUPPORT OF MOTION TO QUASH</u>

    1.     I am a counsel at Perkins Coie LLP and since June 2022 have been seconded to Google LLC as Legal Counsel.

    2.     FBI Special Agent Sean Macmanus submitted a geofence warrant to Google on Sunday, August 7, 2022. Following submission, the FBI reached out to a representative at Google to request that Google expedite processing of the warrant, disclosing that the warrant related to multiple homicides in Albuquerque by an individual who appeared to be targeting Muslim men and was considered an active threat.

    3.     Google began the process of identifying and preserving data responsive to the warrant the following morning, Monday, August 8. I reviewed the warrant that same morning and reached out to SA Macmanus to inform him that the warrant was being processed on an urgent basis, but that due to the size of the request, the processing could take some time. On that call, I also expressed serious concern that, because the search areas defined in the warrant were large and covered densely populated areas in Albuquerque, the warrant was likely going to implicate a large number of users. I asked SA Macmanus whether he would consider pursuing a narrowed search that did not compromise the Government's investigative needs, and whether he would consider obtaining a supplemental search warrant before seeking basic subscriber information for any devices that the FBI deemed relevant to the investigation. SA Macmanus indicated that he was unwilling to narrow the search in any way, but offered his assurance that the FBI's internal tools

would allow him to exclude devices unrelated to the investigation from the Government's scrutiny. He also stated that it was unlikely that the Government would agree to obtain a supplemental search warrant before seeking basic subscriber information pertaining to devices of interest.

4.     On August 9, I received notice that Google had completed the process of identifying and preserving data responsive to the warrant, and I also became aware, via public news outlets, that law enforcement had arrested a suspect in association with the homicides. I called SA Macmanus to communicate that the geofence warrant results had returned and swept in thousands of users, and renewed Google's concerns about the warrant's overbreadth. I offered to expedite processing of any targeted legal process for the primary suspect's account or the accounts of any other individuals under investigation, and discussed with SA Macmanus that targeted legal process could resolve the matter and avoid the constitutional issues raised by the geofence warrant. SA Macmanus acknowledged Google's concerns regarding the scope of the geofence warrant, expressed appreciation for Google's willingness to expedite processing of any targeted legal process, and stated that he would confer with his colleagues to determine whether the Government still wished to pursue the geofence warrant in light of the significant developments in the investigation. SA Macmanus indicated he would likely confirm the Government's position within a day or two, and acknowledged that Google would not take further action on the warrant in the meantime. A true and correct copy of my email to SA Macmanus memorializing our call is attached hereto as Exhibit A (Email from M. Hurley to S. Macmanus, August 9, 2022, 4:40 p.m.).

5.     Later that evening, SA Macmanus confirmed that the Government intended to pursue the geofence warrant because it believed co-conspirators may have been involved in the crimes under investigation. He again offered his assurance that the Government would attempt to exclude as many devices as possible before seeking basic subscriber information under the

geofence warrant. *See* Exhibit A (Email from S. Macmanus to M. Hurley, August 9, 2022, 6:47 p.m.). SA Macmanus indicated that he would inform Google when a targeted warrant for the primary suspect's account had been submitted. *Id.* Finally, he indicated that he intended to speak with the AUSA associated with the investigation and would follow up after speaking with her. *Id.*

6. I promptly responded, thanking SA Macmanus, and letting him know that Google would await further word from him following his conversation with the AUSA. *Id.* (Email from M. Hurley to S. Macmanus, August 9, 2022, 7:04 p.m.).

7. SA Macmanus emailed me shortly thereafter to say he had spoken with the AUSA and FBI management, who were in agreement that they still needed the results of the geofence warrant. *Id.* (Email from S. Macmanus to M. Hurley, August 9, 2022, 7:49 p.m.). He requested production "as soon as possible" and again offered his assurance that the Government "[will] do everything [it] can to narrow the records down as far as possible in an effort to identify co-conspirators." *Id.*

8. The next day, I emailed SA Macmanus and AUSA Kimberly Brawley. I thanked SA Macmanus for clarifying the Government's position on the geofence warrant and requested a call from AUSA Brawley as soon as possible. *Id.* (Email from M. Hurley to S. Macmanus and K. Brawley, August 10, 2022, 3:48 p.m.). I received an out of office message from AUSA Brawley, and so followed up with SA Macmanus to ask that my message be brought to her attention. *Id.* (Email from M. Hurley to S. Macmanus, August 10, 2022, 5:03 p.m.). Later that evening, I received an email from AUSA Brawley offering times for a call the following day. *Id.* (Email from K. Brawley to M. Hurley, August 10, 2022, 10:25 p.m.).

9. Also on August 10, SA Macmanus notified me via email that the Government had submitted a targeted search warrant to Google for an account that it identified as belonging to its

"primary suspect," Muhammad Atif Syed. Exhibit B, Email from S. Macmanus to M. Hurley regarding legal process for primary suspect's account. Google expedited processing of the targeted search warrant and produced responsive records that same evening, approximately seven hours after the targeted warrant's submission. The results indicate that no Location History data was available for the primary suspect's account—meaning that the primary suspect's device would not have been one of the nearly 3,100 devices responsive to the geofence warrant.

10.     The following day, August 11, I spoke with AUSA Brawley. I explained that the warrant implicated thousands of devices. I also explained the nature of the search, including that a user's device would not appear in the results of a geofence warrant unless they had affirmatively opted in to Location History. AUSA Brawley explained she was new to geofence warrants, did not realize that users had to opt-in to Location History in order for their devices to generate responsive data, and was surprised that the targeted search warrant for the primary suspect's account did not return responsive Location History data. AUSA Brawley explained that the Government had obtained the geofence warrant when it had no investigative leads, but that substantial gains had since been made in the investigation, including the arrest of both Muhammad Atif Syed and his son Shaheen Syed, and the gathering of evidence, including data from Muhammad Atif Syed's Google Account, which AUSA Brawley said had been very helpful. AUSA Brawley stated her hope that the geofence warrant would be "moot" by early the following week and suggested that Google and the Government put the warrant "on the backburner" until the following Tuesday, August 16. I again offered to expedite any targeted legal process the Government might obtain.

11.     AUSA Brawley next contacted me on Friday, August 19, to indicate that the Government would not withdraw the geofence warrant and was still seeking production. Ex. A (Email from K. Brawley to M. Hurley, August 19, 2022, 12:26 p.m.). I promptly requested a call,

and was able to connect with AUSA Brawley on Wednesday, August 24. *Id.* (Emails between K. Brawley and M. Hurley). During that call, AUSA Brawley indicated that the Government wished to pursue the warrant because it could not yet rule out the involvement of other perpetrators, and further indicated the Government's position that the search areas were deliberately drawn broadly to help it determine which devices were unrelated to the investigation. I indicated that Google would need to discuss this matter further internally, and AUSA Brawley indicated the Government did not urgently need the data. AUSA Brawley further stated that the Government was working to obtain targeted legal process for Shaheen Syed and potentially other family members, and I again offered to expedite production of any targeted legal process.

12.     To date, Google is unaware of any targeted legal process having been submitted for Shaheen Syed's Google Account, if any, or the Google Accounts of any additional family members or other suspects.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 7th day of September, 2022, in Washington, D.C.

*/s/ Mikella Hurley*
Mikella Hurley

**EXHIBIT A TO HURLEY DECLARATION**



**Mikella Hurley <mikella@google.com>**

## Re: [EXTERNAL EMAIL] - Follow-up from our call re Google Ref. No. 22223149
24 messages

---

**Sean Macmanus** <stmacmanus@fbi.gov>                                      Tue, Aug 9, 2022 at 6:47 PM
To: Mikella Hurley <mikella@google.com>

Thank you Mikella.  I spoke with the supervisor and case agent at our command post.  As you saw, they did arrest a primary suspect.  However, we still need the geofence returns because there is strong evidence that there may be co-conspirators involved who were at or near the crime scenes as well and/or may have committed some of the shootings.  Additionally, there is a concern of retaliation from some of the co-conspirators on other members of the Muslim community due to tips provided about the primary suspect.  One of the victims may have been shot to prevent him from providing information, although I can't say that for sure right now.

I will let you know when the primary suspect's Google search warrant has been served and get you the reference number.  Thank you for your help with that,

As always, we will be diligent in narrowing down the potential devices of interest from the geofence to exclude as many people as we can before we ask for subscriber information.  I am waiting for a return call from the assigned Assistant United States Attorney and will let you know what she says.  Thank you for your help and cooperation.  I appreciate it.

SA Sean Macmanus
National Asset, FBI Cellular Analysis Survey Team (CAST)
FBIHQ Criminal Investigative Division (CID)
Assigned at FBI Albuquerque, Las Cruces Resident Agency
Las Cruces, New Mexico
(575)202-1249 (cell)

---

**From:** Mikella Hurley <mikella@google.com>
**Sent:** Tuesday, August 9, 2022 4:40 PM
**To:** Macmanus, Sean (CID) (FBI) <stmacmanus@fbi.gov>
**Subject:** [EXTERNAL EMAIL] - Follow-up from our call re Google Ref. No. 22223149

Special Agent MacManu

Thank you for taking the time to speak with us today. As I mentioned when we spoke, I'd be happy to ensure that any targeted legal process relating to your investigation is accorded high priority, given the seriousness of the crimes at issue and the urgency  If you or other member  of your team  ubmit targeted legal proce     for thi  ca e, plea e feel free to contact me at this email address to flag it. Please include the Google Reference Number assigned to the LP when it is submitted, so that I can track it.

I look forward to further information from you regarding the pending geofence warrant  A  per today'  call, we will not take any further action on it for the time being. Please do not hesitate to reach out if you have further questions or would like to set up a follow-up call.

Many thank ,
Mikey

---

**Mikella Hurley** <mikella@google.com>                                      Tue, Aug 9, 2022 at 7:04 PM
To: Sean Macmanus <stmacmanus@fbi.gov>

Special Agent Macmanus,

Thank you for your re pon e and for providing thi  additional conte t  We will await further word from you regarding your discussion with the AUSA in this matter. As always, please let me know if I can be of further assistance.

Best regards,
Mikey
[Quoted text hidden]

---

**Sean Macmanus** <stmacmanus@fbi.gov>                    Tue, Aug 9, 2022 at 7:49 PM
To  Mikella Hurley  mikella@google com
Cc: "Kimberly.Brawley@usdoj.gov" <Kimberly.Brawley@usdoj.gov>

I spoke with the AUSA and FBI management.  The consensus of the FBI Office and the US Attorney's Office is that a federal judge ordered that we obtain the records and we do still need them for the reasons I outlined in my earlier email, so if you all would please turn over the records as soon as possible we would appreciate it.  We will do everything we can to narrow the records down as far as possible in an effort to identify co-conspirators.  Thank you for your help in all of this.

Sean

SA Sean Macmanus
National Asset, FBI Cellular Analysis Survey Team (CAST)
FBIHQ Criminal Investigative Division (CID)
Assigned at FBI Albuquerque, Las Cruces Resident Agency
Las Cruces, New Mexico
(575)202 1249 (cell)

[Quoted text hidden]

---

**Sean Macmanus** <stmacmanus@fbi.gov>                    Tue, Aug 9, 2022 at 9:23 PM
To  "mikella@google com"  mikella@google com

Hi Mikella,

The Google search warrant for the main suspect's account is with the judge but may not be signed until tomorrow morning.  Thank you and have a good night.

Sean

---

**From:** Macmanus, Sean (CID) (FBI)    tmacmanu  @fbi gov
**Sent:** Tuesday, August 9, 2022 5:49 PM
**To:** Mikella Hurley  mikella@google com
**Cc:** Brawley, Kimberly (USANM) <Kimberly.Brawley@usdoj.gov>
[Quoted text hidden]

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                    Wed, Aug 10, 2022 at 3:48 PM
To: Sean Macmanus <stmacmanus@fbi.gov>
Cc: "Kimberly.Brawley@usdoj.gov" <Kimberly.Brawley@usdoj.gov>

Special Agent Macmanu   thank you for clarifying the FBI' po ition on thi  matter

Ms. Brawley: it would be helpful to set up a time to speak with you about this geofence warrant as soon as possible. Please let me know if you have any availability to do so today, or tomorrow morning.

Best regards,
Mikey

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                                    Wed, Aug 10, 2022 at 5:03 PM
To: Sean Macmanus <stmacmanus@fbi.gov>

Special Agent Macmanu

Apologies for pinging you again, but I received an out-of-office message from Ms. Brawley, which indicates she's out until next week. Can you potentially bring my prior message to her attention in case she isn't checking her email regularly?

Many thanks,
Mikey

[Quoted text hidden]

---

**Sean Macmanus** <stmacmanus@fbi.gov>                                    Wed, Aug 10, 2022 at 5:04 PM
To: Mikella Hurley <mikella@google.com>

Sure will.  Thanks.

SA Sean Macmanus
National Asset
FBI Cellular Analysis Survey Team (CAST)
Criminal Inve tigative Divi ion (CID)
Assigned at FBI Albuquerque, Las Cruces RA
Las Cruces, New Mexico
575-202-1249 cell

For CAST assistance, please fill out the intake form at https://forms.fbi.gov/cast-intake-form

**From:** Mikella Hurley <mikella@google.com>
**Sent:** Wednesday, August 10, 2022 3 03 24 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>              Wed, Aug 10, 2022 at 10:25 PM
To  Mikella Hurley   mikella@google com
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>

Good evening Ms. Hurley,

Thank you for reaching out and for your di cu ion  with Special Agent Macmanu  about thi  i  ue  Would you be available tomorrow afternoon to discuss this?  I am hopeful I will be available at 1:30 pm MT or later.

Best,
Kim Brawley

Sent from my iPad

On Aug 10, 2022, at 1:49 PM, Mikella Hurley <mikella@google.com> wrote:

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                                    Thu, Aug 11, 2022 at 9:05 AM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>

Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>

Thank you, Ms. Brawley. I am available to speak at 1:30 MT. The rest of my afternoon is somewhat tricky, but I could also potentially speak at 3:30 pm MT. Please let me know when I should reach you and what number I should use.

Best,
Mikey

[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                    Thu, Aug 11, 2022 at 11:31 AM
To: Mikella Hurley <mikella@google.com>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>

Hi Ms. Hurley,

If you prefer to speak at 3:30 pm MT, that works well for me.  My cell number is 505-379-9119.

Thank you,
Kim

Sent from my iPhone

> On Aug 11, 2022, at 7:06 AM, Mikella Hurley <mikella@google.com> wrote:

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                    Thu, Aug 11, 2022 at 1:45 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>

Hi Kim,

3:30 MT will work for me. I'll call you at your cell at that time.

Many thanks,
Mikey

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                    Thu, Aug 11, 2022 at 5:33 PM
To: Mitchell Wootten <mitchwootten@google.com>

[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                    Thu, Aug 11, 2022 at 5:39 PM
To: Mikella Hurley <mikella@google.com>

Hi Ms. Hurley,

I am available to talk now if you would still like to discuss this matter.

Thank you,
Kim

Sent from my iPad

> On Aug 11, 2022, at 11:47 AM, Mikella Hurley <mikella@google.com> wrote:

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                          Thu, Aug 11, 2022 at 6:34 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna
Sridhar <aparnasridhar@google.com>

Hi Kim,

Thank you again for taking the time to speak this afternoon. I am copying my colleague, Aparna Sridhar, on this message
so that you and the FBI team have two points of contact in the event you need to request expedited processing on
additional targeted legal process. Aparna and I work in two different time zones (ET/PT), and together we'll be well placed
to catch things quickly.

Many thanks,
Mikey

[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                Fri, Aug 19, 2022 at 12:26 PM
To: Mikella Hurley <mikella@google.com>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna
Sridhar <aparnasridhar@google.com>, "Ubbelohde, Tamara E. (AQ) (FBI)" <TEUBBELOHDE@fbi.gov>, "Hall, Tavo
(USANM)" <Tavo.Hall@usdoj.gov>

Good morning Mikey,

Thank you again for your patience as we have continued to review evidence and discuss how to best proceed with this
matter.  After giving this matter careful consideration and thought, we have concluded that we do need Google to produce
the information that is included in the geofence search warrant signed by Judge Robbenhaar.  I am copying Tammy
Ubbelohde, the case agent, and Tavo Hall, another AUSA who is also prosecuting this case, on this email chain.  We
appreciate your continued assistance, and please let us know if there are any questions going forward.

Best,

Kim

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                          Fri, Aug 19, 2022 at 12:53 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna
Sridhar <aparnasridhar@google.com>, "Ubbelohde, Tamara E. (AQ) (FBI)" <TEUBBELOHDE@fbi.gov>, "Hall, Tavo
(USANM)" <Tavo.Hall@usdoj.gov>

Hi Kim,

Thank you for this update. Please let me know if you are available to connect at some point today to discuss.

Best,
Mikey
[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                Mon, Aug 22, 2022 at 5:56 PM
To: Mikella Hurley <mikella@google.com>

Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna Sridhar <aparnasridhar@google.com>, "Ubbelohde, Tamara E. (AQ) (FBI)" <TEUBBELOHDE@fbi.gov>, "Hall, Tavo (USANM)" <Tavo.Hall@usdoj.gov>

Hi Mikey,

Thank you for your email and for trying to call me today.  I apologize that I missed you.  Would you have time to talk tomorrow at 10:30 a.m. MT?

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                                        Mon, Aug 22, 2022 at 5:59 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna Sridhar <aparnasridhar@google.com>, "Ubbelohde, Tamara E. (AQ) (FBI)" <TEUBBELOHDE@fbi.gov>, "Hall, Tavo (USANM)" <Tavo.Hall@usdoj.gov>

Hi Kim.

12:30 ET / 10:30 MT works for me. Shall I reach you on your cell?

Many thanks,
Mikey
[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                      Mon, Aug 22, 2022 at 6:02 PM
To: Mikella Hurley <mikella@google.com>
Cc: "Macmanus, Sean (CID) (FBI)" <stmacmanus@fbi.gov>, "Federici, Fred (USANM)" <Fred.Federici@usdoj.gov>, Aparna Sridhar <aparnasridhar@google.com>, "Ubbelohde, Tamara E. (AQ) (FBI)" <TEUBBELOHDE@fbi.gov>, "Hall, Tavo (USANM)" <Tavo.Hall@usdoj.gov>

Hi Mikey,

Thank you for the fast response, and I am glad that time works for you.  Yes, my cell is perfect, and the number is 505-379-9119.  I hope you have a good evening in the meantime.

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>                                        Tue, Aug 23, 2022 at 12:11 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>

Hi Kim,

Very sorry about this, but I've got an urgent conflict with our call time. Are you free during the afternoon, MT?

Apologies - please let me know if there's another time available.

Best,
Mikey
[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>                      Tue, Aug 23, 2022 at 12:24 PM
To: Mikella Hurley <mikella@google.com>

Hi Mikey,

No worries, and it is completely understandable.  I am available today until 1:30 p.m. MT, and my schedule is more flexible tomorrow.  Please let me know what works best for you.


Thank you,

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>       Tue, Aug 23, 2022 at 6:39 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>

Hi Kim,

Sorry for my delayed response on this, and for your understanding. Would you be available tomorrow between 9 AM and 10 AM MT? I am also available at any time prior to 9 AM MT, although that's pretty early for you. Alternatively, I'm available at 12:30 PM MT.

Let me know if there's a convenient time within one of those ranges.

Many thanks,
Mikey
[Quoted text hidden]

---

**Brawley, Kimberly (USANM)** <Kimberly.Brawley@usdoj.gov>       Tue, Aug 23, 2022 at 6:43 PM
To: Mikella Hurley <mikella@google.com>

Hi Mikey,


No need to apologize, and I am available tomorrow from 9:00-10:00 a.m. MT.  Please call me at your convenience.

[Quoted text hidden]

---

**Mikella Hurley** <mikella@google.com>       Tue, Aug 23, 2022 at 6:54 PM
To: "Brawley, Kimberly (USANM)" <Kimberly.Brawley@usdoj.gov>

Thanks, Kim. I'll speak to you then.

Best,
Mikey
[Quoted text hidden]

**EXHIBIT B TO HURLEY DECLARATION**



**Mikella Hurley <mikella@google.com>**

# Google warrant

2 me   age

---

**Sean Macmanus** <stmacmanus@fbi.gov>                    Wed, Aug 10, 2022 at 11:09 AM
To: "mikella@google.com" <mikella@google.com>

The Google warrant for the primary suspect was just served.  Google case number 22342680.  Thank you again for your help

SA Sean Macmanus
National Asset
FBI Cellular Analysis Survey Team (CAST)
Criminal Inve tigative Divi ion (CID)
Assigned at FBI Albuquerque, Las Cruces RA
Las Cruces, New Mexico
575-202-1249 cell

---

**Mikella Hurley** <mikella@google.com>                    Wed, Aug 10, 2022 at 11:37 AM
To: Sean Macmanus <stmacmanus@fbi.gov>

Special Agent Macmanus:

Thank you for alerting me. We will get this prioritized.

Best,
Mikey
[Quoted text hidden]

# EXHIBIT C

**Location 1**

Location 1 is a 300-meter radius around a point (35.0913407, -106.5867457) in the rear parking lot of the Ariana Halal Market & Caffe, 1401 San Mateo Blvd NE, for a period of Sunday, November 7, 2021, between 6:10 p.m. and 7:10 p.m MDT (1 hour). In addition to the market, the search area appears to contain, among other things, approximately 170 residential homes, a portion of a major thoroughfare and multiple residential roads, a church (Crossroads of Albuquerque), and multiple buildings. Upon information and belief, Location 1 is associated with the murder of Mohammad Ahmadi. According to public reports, law enforcement responded to a call regarding a possible shooting at 1401 San Mateo Blvd NE at 6:41 p.m. on November 7, 2021, and found the victim in the rear parking lot of the market.



**Location 2**

Location 2 is a 300-meter radius around a point (central point 35.0736821, -106.6170724) on the intersection of Garfield Avenue SE and Columbia Drive SE, for a period of Thursday, July 21, 2022, between 7:00 a.m. and 8:00 a.m. MDT (1 hour). The search area appears to contain, among other things, a dense residential neighborhood with over 150 residential homes and at least eight apartment complexes, a portion of a thoroughfare and multiple residential roads, Garfield Gospel Chapel, CoDA Social Services Organization, a portion of a cemetery, and Ranchland Hills Golf Club. Location 2 significantly overlaps with Location 4.



**Location 3**

Location 3 is a 300-meter radius around a point (35.0808731, -106.5579344) on the driveway leading to 420 Rhode Island St NE, for a period of Tuesday, July 26, 2022, between 7:30 p.m. and 8:30 p.m. MDT (1 hour). The search area appears to contain, among other things, a dense residential area with approximately 200 plots of mixed single- and multi-family homes, a portion of a thoroughfare and multiple residential roads, the Albuquerque Metropolitan Spanish Seventh-Day Adventist Church, and the Mesa Verde Community Center. Upon information and belief, Location 3 is associated with the murder of Aftab Hussein. According to news reports and publicly available filings, on July 26, 2022, law enforcement was dispatched to 417 Rhode Island Street NE following a shotspotter alert; upon arrival, they discovered the victim at 420 Rhode Island Street NE. Publicly available sources provide conflicting information on the timing of the crime, which appears to have occurred at either 8:02 p.m. or 10:02 p.m. MDT.



**Location 4**

Location 4 is a 300-meter radius around a point (35.0739762, -106.6194864) on the sidewalk in front of a home with the address of 422 Cornell Dr SE, for a period of Monday, August 1, 2022, between 8:50 p.m. and 9:50 p.m. (MDT) (1 hour). The search area appears to contain, among other things, a dense residential neighborhood with over 100 homes and at least eight apartment buildings, Garfield Gospel Chapel, part of a cemetery, a brewery, a grocery store parking lot, and portions of two thoroughfares and multiple residential roads. Location 4 significantly overlaps with Location 2. Upon information and belief, Location 4 is associated with the murder of Muhammad Afzaal Hussain. According to news reports and publicly available filings, on August 1, 2022, at 9:17 p.m., law enforcement was dispatched following a 911 call reporting that multiple gunshots had been fired near the area of Cornell Drive SE and Garfield Ave SE. Upon arrival, law enforcement discovered the victim at 422 Cornell Dr SE.



**Location 5**

Location 5 is a 300-meter radius around a point (35.0683260, -106.6216778) on the Islamic Center of New Mexico (ICNM), for a period of Friday, August 5, 2022, between 1:30 p.m. and 4:30 p.m. MDT (3 hours). In addition to the ICNM, the search area appears to contain, among other things, over 50 homes, at least 30 apartment buildings, a park, two large roadways, and a portion of a University of New Mexico parking lot. Upon information and belief, Location 5 is associated with the funerals of two of the victims, which were held at the ICNM on the afternoon of August 5 and attended by over 1,000 people, including an additional victim and Muhammad Syed.



**Location 6**

Location 6 is a 300-meter radius around a point (35.0815571, -106.5871038) on a commercial building containing the Lutheran Family Services Rocky Mountains and a medical office, 230 Truman St NE, for a period of Friday, August 5, 2022, between 3:35 p.m. and 4:35 p.m. MDT (1 hour). In addition to the commercial building, the search area appears to contain, among other things, over 100 homes, the City Presbyterian Church, approximately three medical facilities, various businesses, and a ten-story commercial building. Upon information and belief, Location 6 is associated with the murder of Naeem Hussain. According to news reports and publicly available filings, the victim departed the funeral of two previous victims (covered by Location 5), drove to the Lutheran Family Services, and was shot in his car at 4:04 p.m.



**Location 7**

Location 7 is a 300-meter radius around a point (35.0818284, -106.5867011) on San Mateo Boulevard NE, for a period of Monday, July 11, 2022, between 9:30 p.m. and 10:30 p.m. MDT (1 hour). The search area appears to contain, among other things, over 100 homes, the City Presbyterian Church, the Lutheran Family Services Rocky Mountains, approximately three medical facilities, various businesses, and a ten-story commercial building. Location 7 significantly overlaps with Location 6.



# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-MJ-1291 JFR |
| | ) | |
| vs. | ) | |
| | ) | |
| **SHAHEEN SYED**, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' MOTION TO DETAIN

The United States moves to have Defendant Shaheen Syed, also known as Maiwand Syed, detained pending trial pursuant to 18 U.S.C. § 3142 on grounds that the defendant presents both a flight risk and a grave danger to the community. For the reasons set forth below, there is no condition or combination of conditions that will reasonably ensure either the safety of the community or the defendant's appearance at trial.

### I.      BACKGROUND

In recent weeks, the City of Albuquerque has been the scene of a series of horrific gun murders. In connection with two of these shootings, on August 9, 2022, the State of New Mexico charged the defendant's father, Muhammad Atif Syed, with two counts of murder. As the ongoing investigation continues to unfold, law enforcement officers also have recently discovered evidence that appears to tie the defendant, Shaheen Syed, to these killings.

*The July 26, 2022, Murder of Aftab Hussein*

On July 26, 2022, at 8:02 p.m., officers from the Albuquerque Police Department (APD) were dispatched to 417 Rhode Island Street N.E., following a ShotSpotter activation. ShotSpotter is a program used by APD to track gunfire in the City of Albuquerque. The ShotSpotter

activation indicated that 13 rounds had been fired in the vicinity of that address, followed by an additional ten rounds. When APD officers arrived, they discovered an unresponsive male with multiple gunshot wounds on the sidewalk near a car parked at 420 Rhode Island Street, NE. The man was pronounced dead on the scene. He was later identified as Aftab Hussein.

At the scene, officers recovered several gun casings, which were later determined to be part of 7.62 millimeter cartridges. This type of ammunition is commonly used with rifles or long guns. The location of the casings indicated that the shooter was behind a bush north of where Mr. Hussein's body was found.

### *The August 1, 2022, Murder of Muhammad Afzaal Hussain*

On August 1, 2022, at approximately 9:17 p.m., APD dispatch received a 911 call in which the caller reported that multiple gunshots had been fired near the area of Cornell Drive SE and Garfield Avenue SE, in an apparent "drive by" shooting.  ShotSpotter activations also indicated that one round, followed by two volleys of seven rounds, had been fired near 420 Cornell Drive SE.

When APD officers arrived, they discovered another male on the sidewalk, pronounced dead at the scene, with multiple gunshot wounds, in front of 422 Cornell Drive SE. The man was later identified as Muhammad Afzaal Hussain.

At the scene, officers determined that two different guns had been fired in this killing, as they recovered seven 7.62 millimeter casings, and seven 9 millimeter casings. After reviewing the ShotSpotter activation, officers believed that the casing they were unable to locate at the scene was a 9 millimeter casing.

### *The August 5, 2022, Murder of Naeem Hussain*

On August 5, 2022, Naeem Hussain attended afternoon funeral services at the Islamic Center of New Mexico in Albuquerque that were held for the two victims that had been gunned

down described above, Aftab Hussein and Muhammad Afzaal Hussain. Later that night, at
approximately 11:57 p.m., APD officers found Naeem Hussain dead in his Toyota 4Runner,
which was parked outside the building housing Lutheran Family Services on 230 Truman Street
NE in Albuquerque. Naeem Hussain had bullet wounds to both his left arm and head.

When officers reviewed video surveillance footage from Lutheran Family Services, they
saw Naeem Hussain park his car in the parking lot of the facility at approximately 3:53 p.m.,
according to the time stamp on the surveillance video.[1] Officers also saw that Naeem Hussain's
4Runner was followed by a light colored sedan. In the video footage, officers also could see what
appeared to be gunshots striking the driver's side window of the 4Runner at approximately 4:04
p.m.

Officers also reviewed traffic camera footage that showed Mr. Hussain's 4Runner as he
departed the funeral services at the Islamic Center of New Mexico for the other victims at
approximately 3:41 p.m. From that footage officers believed that the same light colored, four-
door sedan, which appeared to a Volkswagen Jetta, followed Mr. Hussain's 4Runner after the
funeral services.

### The APD Flyer Concerning the Volkswagon Jetta

Following Naeem Hussain's murder, on or about August 7, 2022, APD released a flyer
with a picture of the suspect Volkswagen sedan, seeking the public's help in identifying the
driver of the car.  The flyer highlighted some damage to the vehicle and the hubcaps of the car.
Both APD and the FBI received multiple tips in reference to Muhammad Atif Syed about the
shootings and the Volkswagen sedan.  APD was also able to determine that on or about February
18, 2022, they had responded to a call for service at the home of Muhammad Atif Syed, where

---

[1] The accuracy of the time stamps on the surveillance video has not yet been determined, but the time stamps appear
to be close to true time.

the defendant also lives, and that a gray Volkswagen Jetta (with the last four vehicle

identification numbers 8047) had been present at the property.

The same day that APD released a flyer describing the suspect vehicle that they were

looking for, Lubna Syed, who is Muhammad Atif Syed's daughter and the defendant's sister,

used WhatsApp to send the defendant a copy of the flyer of the suspect vehicle that APD had

released.  An image of her WhatsApp message to her brother is attached hereto as Exhibit 1.

On August 8, 2022, APD received a tip about hubcaps matching those on the picture that

law enforcement had released being found in a dumpster near a business in Albuquerque.[2] APD

and FBI personnel retrieved the hubcaps and determined that they were Volkswagen hubcaps of

the same type shown in the flyer.

On or about August 8, 2022, APD officers located a gray Volkswagen Jetta at the address

where Muhammad Atif Syed and the defendant live. The hubcaps on the car appeared to have

been removed. At approximately 10:00 p.m. that same day, officers surveilling the residence

observed Muhammad Atif Syed depart his home driving the gray Jetta. Law enforcement later

stopped him on Interstate 40, approximately 100 miles from Albuquerque, on his way to Texas.

At the time he was stopped, the vehicle was bearing a license plate that was not registered to the

car.

### *The Search of the Volkswagen Jetta and of the Defendant's Home*

Law enforcement officers later searched both the residence where Muhammad Atif Syed

and the defendant live, as well as the Volkswagen Jetta that Muhammad Atif Syed was driving.

At the residence officers found two rifles. One rifle, an AK-47 Zastava Arms ZPAM70,

7.62x39 rifle (serial number Z70133061) was found in the bedroom in which Muhammad Atif

---

[2] Google Maps Street View has a photograph of the front of the defendant's home that was taken in January 2022.
The photograph shows a gray Volkswagon Jetta, parked in front of the house, that matches the description of the car
pictured in the APD flyer and is equipped with the hubcaps.

Syed's identification cards were found. A second AK-47 Zastava Arms ZPAM92, 7.62x39 pistol

(serial number Z92-104752) was found in the backroom identified as the defendant's bedroom.

A rifle scope was also found in the residence.

With respect to the Volkswagen Jetta, law enforcement found a 9 millimeter handgun,

and a 9 millimeter casing between the windshield and hood area of the car. They also found two

7.62 millimeter casings in the car.

### Results from the National Integrated Ballistic Information Network (NIBIN)

NIBIN is a computer ballistic information network run by the Bureau of Alcohol,

Tobacco, Firearms, and Explosives (ATF) that compares and matches bullet casings to specific

firearms. In this case, law enforcement officers live-fired all of the firearms they recovered and

submitted those casings, together with the casings found at the murder scenes and the casings

found in the Volkswagen Jetta, to NIBIN.

The result of the NIBIN comparison was a presumptive match that the rifle that officers

had found in Muhammad Atif Syed's bedroom had fired the casings found both at the scene of

Aftab Hussein's murder on July 26, 2022, as well as the casings found at the scene of

Muhammad Afzaal Hussain's murder on August 1, 2022. There was also a presumptive match

between the 9 millimeter casings found at the scene of Muhammad Afzaal Hussain's murder and

both the 9 millimeter handgun found in the Volkswagen Jetta and the 9 millimeter casing found

between the windshield and hood of the car.  Agents are awaiting additional testing to determine

if there are any other NIBIN matches.

### The Defendant's Interview

Officers interviewed the defendant on August 9, 2022, after searching his residence.

During that interview, the defendant initially claimed that he had not been in the Jetta at gun

stores recently, which is not true.

*Ties Between the Defendant and His Father to Specific Firearms*

On July 15, 2022, the defendant and his father, Muhammad Atif Syed, went together to BMC Tactical, in Albuquerque, and picked up two firearms that they had purchased. The defendant picked up a Zastava ZPAPM92 7.62x39 caliber pistol (serial number Z92-10452), and his father picked up a Zastava Arms ZPAPM70 7.62x39 caliber rifle (serial number Z70-133061). Officers found both of these firearms when a search warrant was recently executed at the defendant's home, and both of these firearms had been partially painted white. The rifle, which was found in a box under Muhammad Atif Syed's bed, is the same rifle for which the NIBIN comparisons resulted in presumptive matches for the casings recovered at the scenes of the July 26, 2022, murder of Aftab Hussein and the August 1, 2022, murder of Muhammad Afzaal Hussain.

The ATF Form 4473 that is at issue in the instant case confirms that the defendant completed his purchase of a Romarm, model WASR-10, 7.62x39 caliber rifle (serial number 21A1-88389) on June 11, 2021. On July 22, 2022, Muhammad Atif Syed ordered a mount for this firearm. At approximately 3:15 p.m. on August 1, 2022,[3] Muhammad Atif Syed and the defendant went to Roof Korean Custom Gunsmithing, also located in Albuquerque, to pick up the side mount, and Muhammad Atif Syed also purchased a scope with 3x optics that he handled in the store. The defendant took the WASR-10 rifle into the store, where it was installed with the mount and scope.

*The FBI's Analysis of Cell Tower Data on August 5, 2022*

As part of the ongoing investigation, law enforcement officers have analyzed cell tower data in Albuquerque which they have received as part of the investigation into Naeem Hussain's

---

[3] This is approximately six hours before Muhammad Afzaal Hussein was allegedly gunned down by Muhammad Atif Syed.

murder on August 5, 2022.  They also analyzed activity on cell towers for phone numbers connected with the defendant's phone number and his father's phone number.

Data indicates that at approximately 3:39 p.m., the defendant's phone connected with the defendant's father's phone, at which point the defendant's phone was still somewhere in the general area of the Islamic Center of New Mexico on Yale Boulevard SE in Albuquerque.  Data indicates that at approximately 4:06 p.m., the defendant's phone had moved to an area closer to the location of the August 5 murder.

In terms of location, cell tower data for August 5, 2022, also reveals that between approximately 3:53 p.m. and 3:59 p.m., the defendant's father's phone was located along an arc of radio signals between his cell phone and a cell tower that also encompassed the location where Naeem Hussain was murdered.[4]  The data revealed that between 4:04 p.m. and 4:22 p.m., the defendant's father's phone was still in the general area of the murder.

At approximately 4:14 p.m., the defendant's phone connected with the father's phone, at which point both phones were located in the general area of the murder.  Between 4:18 p.m. and 4:20 p.m., the defendant's phone was located along an arc of radio signals between his cell phone and a cell tower that encompassed the location where Naeem Hussain was murdered.

## II.    ARGUMENT

As this Court is aware, in determining whether there are conditions of release that will both "reasonably assure the appearance" of the defendant at trial and "the safety of any other person and the community," this Court must consider several factors. 18 U.S.C. § 3142(g). Those factors include: (1) the nature and circumstances of the offense charged, including whether the offense

---

[4] Cell tower "dumps" do not provide a constant stream of cell phone location data, or possibly any at all. Rather, some partial location data may be gathered if a customer makes a call or sends or receives a text or uses internet data near a cell tower that is relayed from that cell tower.  The cell phone companies do not always record all activity between the cell phone and the network.

involves a firearm, (2) the weight of the evidence against the defendant, (3) the defendant's history
and characteristics, including the defendant's length of residence in the community, community
ties, past conduct, criminal history and record concerning appearance at court proceedings, and (4)
the nature and seriousness of the danger to any person or the community that would be posed by
the defendant's release.  § 3142(g)(1) – (4).

### A. Defendant Should be Detained Pending Trial Because There Is No Combination of Factors That Can Assure the Safety of the Community or the Defendant's Appearance.

#### 1. Nature and circumstances of the offense.

As described in the criminal complaint, the defendant is charged with lying on an ATF
Firearms Transaction Record (Form 4473) in connection with the purchase of a 7.62X32 rifle on
June 9, 2021. The crime with which the defendant is charged is thus one of moral turpitude.
"Moral turpitude refers to conduct which is inherently base, vile, or depraved, contrary to the
accepted rules of morality and the duties owed between man and man, either one's fellow man or
society in general." *Wittgenstein v. INS,* 124 F.3d 1244, 1246 (10th Cir.1997) (internal quotation
marks omitted). *See Daibo v. Att'y Gen. of U.S.,* 265 F. App'x 56, 60 (3d Cir. 2008) (holding that
a conviction under 924(a)(1)(A) is a crime of moral turpitude).

The defendant's firearms purchase took place at Federal Firearms Licensee (FFL) Omni
Arms LLC on Central Avenue in Albuquerque. On the Form 4473, in which the defendant
certified that his responses were true, correct and complete, the defendant falsely claimed that his
current residence and address was 1817 Ocean Drive, Apt. 225 in Hallandale Beach, Florida.

As explained in the criminal complaint, this offense is serious because 18 U.S.C. §
922(b)(3) places restrictions upon the sale or delivery of any non-FFL residing in a state other
than the FFL in which the firearm is being purchased. Thus, accurate information about a
purchaser's residence factors into an FFL's determination as to whether they can legally transfer

a firearm to that individual. When an individual provides a false residence address, the FFL

cannot properly make this determination. Moreover, by lying on the Firearms Transaction

Record, the defendant caused the FFL to maintain false information in its records. The nature of

the defendant's offense should therefore weigh in favor of detention. *See United States v.*

*Gaston*, No. 2:21-CR-36-JD-JPK, 2021 WL 1170201, at *7 (N.D. Ind. Mar. 26, 2021)

("Regarding the nature and circumstances of the offenses charged, the government alleges that

Gaston has, on multiple occasions, made false statements in connection with the acquisition of a

firearm. Specifically, the Indictment states that Gaston provided an address where he did not

reside on a form used in the purchase of firearms. The rules and regulations concerning the sale

of firearms help ensure that such firearms do not end up involved in criminal activity or fall into

the hands of those who are prohibited from possessing firearms, which is precisely what the

government argues happened here. Since any conduct involving a firearm is inherently

concerning in terms of potential dangerousness, this factor weighs in favor of detention.")

### 2.      The weight of the evidence.

The weight of the evidence against the defendant in this case is also strong, establishes

each of the elements of the charged offense, and again weighs in favor of defendant's detention

pending trial. Here, the United States must simply prove that the defendant "knowingly ma[de]

any false statement or representation with respect to the information required … to be kept in the

records" of an FFL. 18 U.S.C. § 924(a)(1)(A). By contrast to 18 U.S.C. § 922(a)(6), for example,

there is no additional requirement under § 924(a)(1)(A) for the United States to show that the

defendant's false statement was material, or that the defendant had an intent to deceive. *See, e.g.,*

*United States v. Johnson*, 680 F.3d 1140, 1144-45 (9th Cir. 2012) (citing *United States v.*

*Sullivan*, 459 F.2d 993, 994 (8th Cir. 1972)) (rejecting defendant's argument that element of

materiality must be read into § 924(a)(1)(A)); *United States v. Johnson*, 60 F. App'x. 260, 262

(10th Cir. 2003) (unpublished) (rejecting defendant's argument that government must prove

intent to deceive in § 924(a)(1)(A) prosecution).

In this case, the United States easily clears the bar of establishing that the defendant

knowingly made a false statement on the Form 4473 that he is charged with falsifying.  The

United States' evidence includes the fact that, during an interview with law enforcement officers

on August 9, 2022, the defendant told the officers that he had lived in Albuquerque since 2016

without qualification.  FBI agents in Florida have also interviewed board members and the office

manager for the property in Florida where the defendant claimed to have been living in June

2021 and they confirmed to the FBI that a couple had been living in that unit since May 2021.

They also indicated that they had no record of Shaheed Syed, aka Maiwand Syed, ever living in

that unit. They further confirmed that the board would have been aware if the unit had been

subleased.

3. **Defendant's history and characteristics, including the defendant's length of residence in the community, community ties, past conduct, criminal history, and record concerning appearance at court proceedings.**

In addition to the developing evidence that appears to connect the defendant to his

father's activities, there are other disturbing reports that cast light on the defendant's history and

characteristics, which also weigh in favor of the defendant's detention pending trial.

*July 21, 2021, shooting at Walmart*

For example, on July 21, 2021, APD officers responded to the Walmart store located on

San Mateo Blvd. where shots had been fired. While at the Walmart, officers learned that there

were two males at the APD Southeast Substation who appeared to be have been involved in the

incident at Walmart. Those two individuals turned out to be Shaheen Syed and his brother, Adil

Syed.  A copy of this police report is attached hereto as Exhibit 2.

At the station, the defendant told officers that he and his brother had been driving to the

Walmart when they had an aggravated driving incident with a man driving a black sedan. The

defendant told the officers that the incident had occurred before they reached the Walmart store,

but he thought that they scared the driver because it looked like they had followed him to the

Walmart. The driver of the black sedan then "brake checked" the defendant and his brother at the

entrance to the Walmart parking lot. The defendant and his brother then tried to quickly pass

when the driver of the sedan stepped out and flashed a firearm. The driver sat back down but the

defendant stated that he could see that the driver still had the gun pointed at them and was

following them. The defendant then stopped the car and his brother, Adil, stepped out of the

passenger side of the car and shot at the black sedan. The defendant told APD that they did not

know if Adil had hit anyone in the black sedan, and they instead left and went home so as not to

worry their mother. Officers later located the firearm from the defendant's home, where he lived

with his brother. Officers also later reviewed security footage of the incident from the Walmart

parking lot and determined that the defendant's story was consistent with the video footage they

saw.

While it appears that no charges were ultimately brought against the defendant or his

brother in this case, it is also true that most upstanding individuals manage to avoid getting

themselves involved in road rage incidents that escalate to the level where guns are flashed, and

then fired, in a public space. This is especially true where the defendant and his brother

apparently chose to stop their car to allow Adil to get out of the car and fire at the sedan.

### *The defendant's outstanding arrest warrant for battery against his minor sister*

On February 27, 2022, APD officers responded to a call about a domestic violence

incident that had occurred concerning the defendant hitting both his younger sister (who was a

16-year-old minor at the time) and his father. In the APD report regarding the incident, officers

reported that the defendant's father told them that approximately 30 to 45 minutes before the

officers arrived at their home, the defendant had gone and started knocking on the door of his younger sister. The defendant's father then went into the room to stop the defendant from hitting his younger sister when the defendant started hitting his father in the face. The officers noticed blood all over the father's face. They asked the defendant's father whether he wanted to press charges against his son, and he answered in the affirmative, indicating that he wanted justice.

The police report is also notable for the fact that officers described how uncooperative the family members, other than the father, were with the police. When they sought to question the minor sister, who the father said had been struck, for example, the other family members spoke to her in Pashtol. She then told the officers that she did not know what had happened. She also told officers that she did not know where her brother was. The police report also indicated that "[t]his was not the first time [the sister] was injured by her brother to the point where she was in the hospital." A copy of the February 27, 2022, police report is attached hereto as Exhibit 3.

APD officers subsequently filed a criminal complaint and, on March 21, 2022, issued the defendant a summons to appear on a criminal charge of battery on a household member. When the defendant subsequently failed to appear, Judge David Murphy issued a bench warrant on April 4, 2022.  That warrant remains outstanding.

In terms of the defendant's ties to the community, it should also be noted that the defendant's father's explanation to agents as to why he was leaving Albuquerque in the dark of night was because he wanted to find a new place for his family to live, away from the dangers of Albuquerque. His adult daughter reportedly said something similar in a recent news report.  If that explanation from the family is to be believed, then it would obviously complicate the defendant's claim that he should be released based on his strong ties to Albuquerque. The reality is that the defendant has strong connections to a region of the world other than the United States, has a passport, and he speaks another language, which means that he would be on much better

footing than others lacking that background if he was released and decided to flee the United

States.

Finally, the defendant has demonstrated himself to be a serial liar.  Deception is at the

heart of the instant charges.  Defendant's lies on the ATF Form are not isolated, however, as

revealed by his subsequent lies to the officers.  Defendant's propensity for dishonesty should

undermine the Court's confidence that he will be forthright with any probation officer tasked

with supervising him on any form of pretrial release.

> ### 4. The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

The evidence that agents have been able to gather thus far in this rapidly unfolding

investigation is obviously alarming with respect to the defendant's short and frequent

communications with his father both before and after the murder of Naeem Hussain on August 5,

2022. Again, agents believe that Muhammad Atif Syed was aware that Naeem Hussain had

attended the funeral services for the other victims and subsequently began following him to the

Lutheran Family Services where Naeem Hussain was gunned down at approximately 4:04 p.m.

Telephone calls between Muhammad Atif Syed and the defendant would be consistent with

quick surveillance calls, both before and after the shooting. And there appears to be no logical

reason for the defendant to have just happened to have been in the vicinity of the murder scene

so shortly after Mr. Hussain was murdered.

It is also undeniable that during his interview with officers, the defendant initially sought

to distance himself from the Volkswagen Jetta, as well as the gun shop where he accompanied

his father during his purchase of a rifle scope on August 1, 2022, the very day of one of the

murders. The fact that his sister sent the defendant a picture of the APD flyer picturing that same

car also suggests that the defendant knew much more about the situation than the rest of a city

that was on edge.

### III.    CONCLUSION

For the reasons outlined above, the United States requests that the Court find the defendant

is a danger to the community and a flight risk and order that he be detained pending trial because

no condition or combination of conditions will reasonably assure his appearance at trial.

Respectfully submitted,

ALEXANDER M.M. UBALLEZ
United States Attorney

*Electronically Signed*
KIMBERLY BRAWLEY
FRED FEDERICI
Assistant U.S. Attorneys
P.O. Box 607
Albuquerque, New Mexico 87102
Phone: (505) 346-7274
Fax: (505) 346-7296

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court using
the CM/ECF electronic filing system which will
send notification to all counsel of record.

*Electronically Signed*
KIMBERLY BRAWLEY
Assistant U.S. Attorney

3:06

Lubna

#LearnOnTikTok #TikTokPartner #H...
www.tiktok.com

https://www.tiktok.com/t/ZTRDWtrgU/?
k=1

9:30 PM

Mon, Aug 1

Take Adil to that place which I took you for applying citizenship ok today

9:37 AM

Sunday

→ Forwarded



# WANTED

**THE VEHICLE PICTURED BELOW IS SUSPECTED AS BEING USED AS CONVEYANCE IN RECENT HOMICIDES OF 4 MUSLIM MEN**

APD IS ASKING THE PUBLIC FOR ASSISTANCE WITH THE IDENTIFICATION OF THE VEHICLE IN THE PHOTOS ABOVE. THE VEHICLE IS A DARK GRAY / SILVER VOLKSWAGEN SEDAN WITH FOUR DOORS AND TINTED WINDOWS. THE VEHICLE APPEARS TO BE A JETTA.

IF YOU HAVE INFORMATION PLEASE CALL CRIME STOPPERS AT 843-STOP.
HTTP://WWW.CRIMESTOPPERSNM.COM/

4:49 PM

GOVERNMENT EXHIBIT 1

PENGAD 800-631-6989

  

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG. OFFENSE DATE 07-21-2021 | SUP. DATE 07-21-2021 | CASE NO. | INC. NO. | PAGE 1 | OF 3 |
|---|---|---|---|---|---|---|

| ORIGINAL OFFENSE REPORTED | | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) | | DATE OF BIRTH |
|---|---|---|---|---|
| 30-03-02A  Aggravated Assault/Deadly Weapon  1304 | | SYED  ADIL | | |

| LOCATION OF OCCURRENCE |
|---|
| 301 SAN MATEO BL SE  ALBUQUERQUE  87108 |

| OFFENSE | | ADDITIONAL OFFENSE / INCIDENT | STATUTE OR ORDINANCE | FEL MISD | ATTEM PTED | COMP-LETED | UCR OFFENSE CODE | CRIMINAL ACTIVITY CODE | LOCAT CODE | WEAPON CODE UP TO 3 PER OFFENSE | | | OFFENDER(S) SUSPECTED OF USING | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | ALCOHOL | DRUG | COMP | UNK |
| | 4. | Aggravated Assault/Deadly Weapon  1304 | 30-03-02A | F | | X | 13A | | 18 | 11 | | | | | | |
| | 5. | Misdemeanor Warrant | MISDEMEANOR WARRANT | M | | X | 90Z | | 13 | | | | | | | |
| | 6. | | | | | | | | | | | | | | | |
| | 7. | | | | | | | | | | | | | | | |
| | ADD'L ON | | | | | | | | | | | | | | | |



| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG. OFFENSE DATE: 07-21-2021 | SUPP. DATE: 07-21-2021 | CASE NO. | INC. NO. | PAGE 2 | OF 3 |
|---|---|---|---|---|---|---|

| ORIGINAL OFFENSE REPORTED | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) | | DATE OF BIRTH |
|---|---|---|---|
| 30-03-02A | SYED | ADIL | |

**LOCATION OF OCCURRENCE**
301 SAN MATEO BL SE      ALBUQUERQUE      87108

1    On July 21, 2021 at 1732 hours I was dispatched to the Southeast Substation located at 800 Louisiana Blvd in
2 reference to Officer H. Corona #▮▮▮▮ being flagged down by a male later identified as Adil Syed. Officer
3 Corona stated that the male stating that he was involved in a shooting at Wal- Mart earlier today at 301 San
4 Mateo Bl Se. I told Officer Corona that I could go on scene to take over the investigation from him due to it being
5 part of my call earlier in the day.
6
7    Upon arrival I saw a white Mazda with a black front end which was the initial description of the offenders
8 vehicle. I made contact with Adil Syed and read him his Miranda Rights in which he agreed to speak to me
9 without a lawyer. He stated that he went to cash a check at an unknown bank and they denied him due to him not
10 having an account with them. They directed him to a Wal-Mart stating that they would cash it.
11
12    He left and started heading to the Wal- Mart located at 301 San Mateo BL SE. There was a black vehicle that
13 was driving aggressively around Carlisle. He stated that the black vehicle was also traveling south on San Mateo
14 and believes that that male later identified as E▮ O▮▮▮▮▮ may have thought that he was following him. The black
15 vehicle also pulled into the parking lot of Wal-Mart and stopped. He stated that he was still behind it when E▮
16 exited the vehicle he had a gun in his hand and "flagged" them with it while they were still inside their car. They
17 were in fear for their life at this time and also had a firearm so they fired at E▮ as they drove around him to get
18 away. Adil admitted to firing about eleven shots at the black vehicle.
19
20    Adil stated that he fled the area and did not call police due to not wanting his parents to find out about the
21 incident. Once his parents weren't home that is when him and his brother Maiwand Syed left and drove to the
22 substation. He stated that he wants to press charges and is willing to co operate with officers. Initially he was not
23 sure and stated that he would do what his brother said. Then made a statement that if E▮ was pressing charges
24 then he would. I stopped him and explained to him it does not work that way. That he needed to focus on himself
25 and what he wants to do. This is when he said he wanted to press charges.
26
27    I ran Adil through NCIC and he returned with having an outstanding warrant of aggravated assault with a
28 deadly weapon with the number of T4DV2020001965. I called the on call Impact Det. which was P. Olivas who
29 stated that he would assist with the call. I told him that I needed to re watch the video footage at Wal- Mart again
30 due to the picture being foggy when I initially saw it and it was brief. I also wanted Officer Roman to watch it to
31 have another set of eyes to confirm the events. Det. Olivas stated that he was going to confirm with the District
32 Attorney if we could do permission to search while I did this.
33
34    Officer Roman and I went to Wal-Mart to watch the footage. It was a different employee who pulled up the
35 footage and showed us multiple angles instead of the one. It showed E▮ pull into the parking lot in his black
36 Nissan and stop by the curb in front of the garden center. Adil pulls in as well behind him in the white Mazda. You
37 can see E▮ exit his vehicle and turn back towards Adil. I did not see anything in his hands at this time or any
38 signs that a gun was fired. E▮ gets back into the driver seat and Adil drives around the Nissan on the south side
39 of it. Then the Mazda stops and a male exits the Mazda and walks up to the Nissan and appears to shoot at it. I
40 could not see a weapon at this time on footage. He enters the Mazda and then it fled the area.
41
42    I spoke with Det. Olivas who stated that it was confirmed that we could do a permission to search to retrieve the

| | | RANK | I.D. NO. | DATE | DETECTIVE / FOLLOW-UP OFFICER / REFERRED TO | | I.D. NO. | DATE |
|---|---|---|---|---|---|---|---|---|
| **STATUS** | REPORTING OFFICER (PRINT) BACA, ALYCIA | P1C | F▮▮ | 07-21-2021 | | | | |
| | ASSISTING OFFICER (PRINT) ROMAN, CRISTINA | P1C | F▮ | 07-21-2021 | PROCESSED BY | DATE | DATA ENTRY PERSON | DATE |
| | APPROVING OFFICER (PRINT) ADKINS, MARK | RANK | F▮ | 08-17-2021 | | | | |

INCIDENT STATUS: ACTIVE ☒ INACT ☐ CLOSED ☐   UF. ☐   CLA ☐   CLE ☐    EXCEPT CODE    A-DEATH OF OFFENDER   B-PROSECUTION DECLINED   C-EXTRADITION DENIED   D-VICTIM REF TO COOP   E-JUV NO CUSTODY   N-NOT APPLICABLE

DISTRIBUTION: ☐ B   ☐ NE   ☐ SW   ☐ DAL   ☐ OTHER ____    ☐ IA   ☐ SE   ☐ VA   ☐ FTHL   ☐ CACU   ☐ NW

CASES CLEARED BY THIS ARREST CASE NO.   CASE NO.   CASE NO.   REV 3/94

| STATE OF NEW MEXICO SUPPLEMENTAL REPORT | ORIG. OFFENSE DATE 07-21-2021 | SUPP. DATE 07-21-2021 | CASE NO. | INC. NO. | PAGE 3 | OF 3 |
|---|---|---|---|---|---|---|

| ORIGINAL OFFENSE REPORTED | ORIGINAL VICTIM'S NAME (LAST, FIRST, MIDDLE) | | DATE OF BIRTH |
|---|---|---|---|
| 30-03-02A | SYED | ADIL | |

| LOCATION OF OCCURRENCE | | |
|---|---|---|
| 301 SAN MATEO BL SE | ALBUQUERQUE | 87108 |

43  firearm from Adil. Officer Roman and Officer Pino did that (refer to Officer Romans supp). I turned in the
44  permission to search to Records. Adil stated that the firearm was in his bedroom. He stated that when you walk in
45  and turn to your right that there is a door leading to a closet. He stated that when you open the door and look to
46  your left that there is a shelf with two bags on it and the gun is in between the two bags.
47
48  I confirmed Adil's warrant prior to placing him in handcuffs and transported him to the PTC without incident.
49  The firearm was tagged in by the Field Investigator. I spoke with Det. Olivas again at the PTC and he stated to
50  forwarded him my reports and he will do follow up due to Earl showing an address in Rio Rancho. This concludes
51  my involvement in this case. A copy of my video will be uploaded into evidence.



**Albuquerque Police Department**

| **Report #** ███████ | **- Offense/Incident Report** | | |
|---|---|---|---|
| REPORT CREATED DATE/TIME | AREA COMMAND / SECTOR / BEAT | | INCIDENT DATE / TIME - FROM - INCIDENT DATE / TIME - TO |
| Mar 1, 2022 08:36 | SOUTHEAST / 32 / 323 | | Feb 27, 2022 19:45 – 23:55 |
| PRIMARY REPORTER | | BODY WORN CAMERA? | |
| Jessica Gomez # ███ | | Yes - Video Footage Available - EVIDENCE.COM | |

ASSISTING PERSONNEL / TYPE(S)

Lonetta Gallegos # ███ (Secondary Officer)

███████████████████████████████████████

| ☐ YES ■ NO | ☐ YES ■ NO | ☐ YES ■ NO |
|---|---|---|

EVENT STATISTICS

| | |
|---|---|
| ☐ Conflict Resolution/Mediation | ☐ Demonstration |
| ☐ Gang Related (Suspected) | ☐ Homeless Involved |
| ☐ Balloon Fiesta | ☐ Gun Involved |
| ☐ Natural Hazard | ☐ Narcotics Involved |
| ☐ Demonstration/Protest | ☐ Loud Vehicular Noise/Drag Racing |
| ☐ TRU | ■ Domestic/Family Violence |
| ☐ Child Present | ☐ School-Based Event |

## SYNOPSIS

On 02/27/2022 I was dispatched t███████████████ egards to a male, Maiwand Syed, who hit his father and sister. Maiwand summons for battery on a household member.

## NARRATIVE

On 02/27/2022 I was dispatched to 3513 CREST AV SE #A in regards to a male, Maiwand Syed, who hit his father and sister. I used the telephone interpreter service to interview, Muhammad, in his primary language, Pashtol. I made contact with father, Muhammad Syed, who stated that his son, Maiwand, hit him in the face. I asked Muhammad what happened tonight and he stated about 30-45 minutes ago, his son knocked on his daughter, Tamana Skyed, bedroom door while she was studying and went in and started hitting his sister for an unknown reason. At this time Muhammad went into the room to stop Maiwand from hitting his sister when Maiwand started hitting his father, Muhammad, in the face. I noticed that Muhammad had blood all over his face. I asked Muhannad if he wanted medical attention and he stated no that he was okay at this time. I asked Muhammad if he wanted to press charges he said yes I want justice.

I went inside the house with the other officers on the scene who stated that Maiwand was no longer at this address. These officers also stated that no one would say anything about what happened tonight. The oldest sister Leubna Syed also arrived at the apartment. She stated she does not live in the apartment. She does come to the apartment daily. The mother, Bibi, stated she wanted Leubna to translate for her. I asked the mother, Bibi, what happened tonight and she stated nothing happened that her husband was lying. I asked the mother where her son was located and she stated that she did not know where her son, Maiwand, was located. I asked the mother what her son s birthday was and she said " I don t know because i m uneducated". I asked how she does not know her son s birthday and she said " I don t know". I asked the mother what happened to her husband and she stated " I don t know". I told the mother that she should want to help her daughter and her husband.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| *(signature)* | *(signature)* |
| PRINT NAME | PRINT NAME |
| Jessica Gomez # ███ Apr 20, 2022 08:25 | Julie Maycumber # ███ Apr 23, 2022 15:44 |

I asked the daughter, Tamana, if I could talk to her and everyone started speaking to her outside alone. Once I asked Tamana if I could talk to her, everyone in the house started talking to her in Pashtol. I asked everyone to stop and asked her to go outside with me so I could talk to her about tonight s incident. I spoke to Tamana and asked her what happened and she stated she did not know. I asked Tamana where her brother was located and she stated " I don t know". I asked her about her and her brother and she stated nothing happened. I asked how come Tamara father was bleeding from his face and she stayed quiet. I told Tamana to look at her father s face as he was sitting right next to her but she would not look at him. Again I asked Tamara " why is your dad bleeding" and she would not say anything. I told Tamana to stay with her dad while I spoke to the other officers inside the home. At this time we do not have any charges as Tamana will not state anything happened. Tamana went back inside with her family.

Officer M. Witt/3513 spoke to the little brother who stated that he was in his room when he hear the commotion in the other room. The little brother stated he did not see anything only heard a commotion going on.

I went back into the house and tried to talk to the mother again. I asked Bibi what her son s birthday was and she kept saying she did not know. I asked Bibi if she had anything that had his information on it and she stated no. I explained to Bibi that it s not right for someone to hurt another person and get away with it. I asked Bibi what her son birthday was and she said the same thing as last time. Officer Terrazas /3515 informed the family that officers have a job to do and explained to them how it works when you come in contact with law enforcement. Officer Terrazas stated to the children that if their parents do want corporate that they need to. I advised the children that they need to help one another out because they are all they have. Officer Witt talks to the family telling them that lying does not help us and withholding information is not okay. The other officers try talking with the family at this time asking about the son s birthday. At this point, we have no information regarding the son besides his name. The older sister Leubna stated that they did not celebrate birthdays. I asked the father if they celebrate birthdays and he stated "yes why would you ask that". The family kept saying they were safe and everything was okay. I advised the mother and Leubna that Maiwand will be receiving a summons in the mail. I asked if they understood what a summons was and they said no, so I explained it to them. I explained to them that even though he is not here at this time that he is still in trouble for what he did to his father. I told Leubna to tell her mother that she should be disappointed in herself. Leubna asked what does that mean and I said "ashamed" and walked out of the house.

Leubna stated to another officer that she wanted a supervisor. Sergeant Maycumber/[REDACTED] arrived on the scene and spoke to the family. Leubna filled out a CPC and my Sergeant processed it. At this time Muhammad stated that he wanted to go to the hospital by himself and that I could use my OBRD to capture his injuries. At this time I left the scene.

This is not the first time Tamana was injured by her brother to the point she was in the hospital and taken into custody by CYFD ref [REDACTED].

Maiwand Syed was summons for battery on a Household member. CPC was processed by my sergeant. My OBRD was docked and uploaded. No other information at this time.

## OFFENSE-1

OFFENSE CODE
**Battery HHM DV | 1313 | 30-03-15**

| OFFENSE START DATE | OFFENSE END DATE | OFFENSE COMPLETION | SUSPECTED HATE CRIME |
|---|---|---|---|
| Feb 27, 2022 19:45 | Feb 27, 2022 23:55 | ■ COMPLETED  ☐ ATTEMPTED | ☐ YES ■ NO |

| DOMESTIC/FAMILY VIOLENCE | WEAPON / FORCE INVOLVED | | |
|---|---|---|---|
| ■ YES ☐ NO | Hands/Feet | | |

GANG INFORMATION
None/Unknown

*OFFENSE LOCATION*

[REDACTED]

| CITY | STATE | ZIP | COUNTRY CODE |
|---|---|---|---|
| ALBUQUERQUE | NM | 87106 | US |

| LOCATION CATEGORY | AREA COMMAND / SECTOR / BEAT |
|---|---|
| | |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| *(signature)* | *(signature)* |
| PRINT NAME | PRINT NAME |
| Jessica Gomez # [REDACTED]   Apr 20, 2022 08:25 | Julie Maycumber # [REDACTED]   Apr 23, 2022 15:44 |

| WHERE INJURED- | INJURY TYPE | DESCRIPTION OF INJURY |
|---|---|---|
| Face | Apparent Minor Injury | nose |

/ ESTIMATED AGE RANGE





# EXHIBIT E

FILED IN MY OFFICE THIS

AUG 1 0 2022 4:38 PM

CLERK DISTRICT COURT
Malcolm Smith

FILED IN THIS OFFICE
TIME___*1:66*___

AUG 1 0 2022

CLERK-METROPOLITAN COURT
BY_____

STATE OF NEW MEXICO
COUNTY OF BERNALILLO
SECOND JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO,
    Plaintiff,

vs.

MUHAMMAD ATIF SYED,
    Defendant.

D-202-PD-2022-00734
Court Number: T-4-FR-2022-003762

### STATE'S EXPEDITED MOTION FOR PRETRIAL DETENTION AND TO APPEAR REMOTELY FOR PRE-TRIAL DETENTION HEARING DUE TO COVID-19 PUBLIC HEALTH EMERGENCY

COMES NOW, the State of New Mexico, and hereby moves this Court for an order detaining Defendant under Rule 5-409 NMRA and Article II, Section 13 of the New Mexico Constitution while trial in this case is pending. Such an order is appropriate because "no release conditions will reasonably protect the safety of any other person or the community." 5-409 NMRA.

Pursuant to New Mexico Supreme Court Order 20-8500-002, the State also respectfully moves to appear telephonically or by audio-visual attendance at the pre-trial detention hearing.

The State intends to show that the defendant should be detained for the following reasons:

    This defendant is charged with a felony:

- 30-02-01(A)(2): Murder in the first degree (felony murder)

The nature and circumstances of the offense charged and the weight of the evidence against the Defendant are sufficient to merit the Defendant's pretrial Detention. The facts below are taken from the sworn affidavit filed in this cause number.

On July 26, 2022, the defendant hid behind a bush near the first victim's driveway. As the victim pulled into the driveway and exited his car the defendant opened fire and shot approximately 13 rounds at the victim. The defendant struck and killed the victim. Days later, on August 1, 2022, the defendant shot and killed a second victim before driving away from the scene. A search warrant executed on the defendant's home revealed multiple firearms that matched the casings found at the scenes of the crimes.

The nature and seriousness of the danger posed to any person and/or the community by the Defendant's release merits the imposition of pretrial detention. There are no conditions of release that will keep the community safe.

The defendant has already shot and killed two people. His actions make it clear that human life holds no value to the defendant. He is a very dangerous person, and the only way to protect the community is to hold the defendant in custody until this matter is resolved at trial.

On March 11, 2020, the Governor of New Mexico declared a public health emergency to minimize the spread and adverse impacts of COVID-19 in New Mexico. The Federal Government has issued COVID-19 guidelines to avoid social gatherings of more than ten people.

The Centers for Disease Control recommends as mitigation activities that people limit their movement in the community and practice social distancing.

The confined indoor spaces in courthouses present an obstacle to practicing social distancing.

In Order No. 20-8500-002, the New Mexico Supreme Court authorized appearances by attorneys, defendants, and witnesses by telephone or by audio-visual attendance.

Permitting remote appearances by attorneys for the State and witnesses will foster social distancing without interfering with courtroom operations and thereby help minimize the spread and adverse effects of COVID-19.

If permitted to appear remotely, counsel for the State will provide documentary exhibits to the Court and the defense by email.

## CONCLUSION

For the above referenced reasons, and in the interest of the security and public safety of the law abiding citizens of New Mexico, the State requests that this Court:

Make a finding of probable cause based on the complaint in this matter;

Issue a warrant for Defendant's arrest to temporarily detain Defendant for a pretrial detention hearing if Defendant is not currently in State custody. If Defendant is in State custody, the State requests that this Court issue an order temporarily denying release provisions to keep Defendant in State custody while awaiting a pretrial detention hearing;

3

Transfer or set this matter for a hearing in the District Court wherein the State will prove by clear and convincing evidence that no release conditions for Defendant will reasonably protect the safety of any other person or the community; and

Allow the parties and witnesses to appear telephonically or by audio-visual attendance at the pre-trial detention hearing.

Respectfully Submitted,

/s/ John Litchford
John Litchford
Assistant District Attorney

**\*Please send any notices to <u>John Duran</u>\***
Assistant District Attorney
Office of the Second Judicial District Attorney
520 Lomas Blvd. NW
Albuquerque, New Mexico 87102

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Motion was sent to counsel for the defense on 8/10/2022.

/s/ John Litchford

Time needed for Motion: 15 Minutes

## STATE OF NEW MEXICO
### -VS-

**ARTICLE 2**
INITIATION OF PROCEEDINGS
**STATE OF NEW MEXICO**
**COUNTY OF BERNALILLO**
**IN THE METROPOLITAN COURT**

Name: Syed, Muhammad Atif

Arrest Date: AUG -9 PH 9:09

Arrest #:
Docket #: T4FR2022-3762
Date Filed:   8/9/2022

Charge(s): **Murder (open count) 2x**

Affiant – Officer/Detective  L. Wise                    Man #:  5168

# CRIMINAL COMPLAINT - ARREST WARRANT AFFIDAVIT

The undersigned, under penalty of perjury, complains and says that on or about the 26th day of July, 2022 and 1st Day of August, 2022, In the County of Bernalillo, State of New Mexico, the above-named defendant(s)

## July 26, 2022

### 2202 hours

Albuquerque Police Department (APD) Dispatch received a ShotSpotter activation in the area of 417 Rhode Island St. NE. ShotSpotter is a program used by APD to track gunfire in the city of Albuquerque. Comments on the ShotSpotter activation showed 13 rounds fired then additional rounds fired in the area of 417 Rhode Island St. NE.

### 2207 hours

APD Officers were dispatched to 417 Rhode Island St. NE in reference to the above-mentioned information. When Officers arrived they located a male, Aftab Hussein, lying next to a silver Hyundai sedan at 420 Rhode Island St. NE. Aftab appeared to have multiple gunshot wounds to his person. Aftab was pronounced deceased on the scene by emergency medical personnel. Detective C. Hoffman arrived on the scene and took case responsibility of the homicide.

Through the course of Detective Hoffman's investigation, he learned that Aftab sustained multiple gunshot wounds. 7.62X39 casings were located on the scene of Aftab's homicide. From the evidence located on the scene of the shooting, Detective Hoffman learned that the suspect, in this case, waited behind a bush, north of the driveway where Aftab Hussein would park his vehicle. As Aftab exited his vehicle, the suspect shot Aftab through the bush multiple times.

## August 1, 2022

### 2117 hours

Albuquerque Police Department (APD) Dispatch received a 911 call in the area of Cornell Dr. SE and Garfield Ave SE. The caller stated there were multiple gunshots in the area and believed there had been a "drive-by" shooting. The 911 caller advised a vehicle drove away at a high rate of speed after the shooting.

### 2119 hours

APD Officers were dispatched to the area of 420 Cornell Dr. SE in reference to the above-mentioned information.

**2120 hours**

APD Dispatch received three ShotSpotter activations. The first activation was for one round in the area of 420 Cornell Dr. SE. The next two were seven rounds each and also at 420 Cornell Dr. SE.

**2123 hours**

APD Dispatch received a 911 call from multiple subjects advising of s shooting in the area of 422 Cornell Dr. SE. Additionally, 911 callers stated a subject appeared to be shot on the sidewalk, in front of 422 Cornell Dr. SE.

**2127 hours**

APD Officers arrived on the scene of the shooting where they located a male, later identified as Muhammud Afzaal Hussain, with multiple gunshot wounds. Afzaal was pronounced deceased on the scene. Officers located seven 9mm casings and seven 7.62X39 casings in the area of the shooting. After reviewing the ShotSpotter, I believe the missing 15th round to be a 9mm round due to the capture on the ShotSpotter tower.

**2142 hours**

I received a call from APD Dispatch who advised me of a homicide call-out located at 422 Cornell Dr. SE. I told APD Dispatch I would go to the scene of the homicide and assist in the investigation.

**2305 hours**

I was present, inside the APD mobile crime van, for the initial officer briefing led by Officer D. Arruit #5764. After the briefing, I learned that Afzaal was in possession of a cellular phone which was located on his person. This cellular phone was collected and later provided to me. I observed this cellular phone to be a white Apple iPhone in a clear rubber case. There are no identifying numbers on the cellular phone. The cellular phone had a cracked screen protector on the front of the cellular phone.

## August 2, 2022

**1038 hours**

Detective J. Moenart and I met with Afzaal's family at the Family Advocacy Center.
Afzaal's brother, Muhammad Imtiaz Hussain, provided me with Afzaal's phone number, (505) 340-4142. Imtiaz stated his brother and family routinely take walks around the neighborhood from around 9:00 Pm to 10:00 PM at night. On August 1, 2022, at approximately 9:00 PM Imtiaz observed Afzaal leave their apartment located at 402 Cornell Dr. SE and walk outside while on his cell phone. This is the last time Imtiaz saw his brother Afzaal.

**1253 hours**

I conducted an interview with a witness, Bailey Cassel who provided the following information: On the night of the shooting, Bailey was across the street from 422 Cornell Dr. SE when she heard gunshots. Bailey observed a dark silver or gray 4-door sedan pull up to the east side of Cornell Dr. SE, in front of 422 Cornell Dr. SE. The sedan was facing north on Cornell Dr. SE. Bailey heard more gunshots so she lay down on the ground until the gunshots stopped. Bailey stated the vehicle then fled the area.

**1538 hours**

I received a call from Saad Nasir, a friend of Afzaal Hussain. Saad provided the following information: On August 1, 2022, at approximately 8:35 PM, Saad was speaking on the phone with Afzaal over FaceTime. Afzaal began to get a call waiting on his phone so he told Saad that he had an issue and had to answer the other line. Saad stated after this phone call he did not hear from Afzaal again.

## August 3, 2022

**1500 hours**

I was contacted by Sgt. D. Fox who advised me that a NIBIN (National Integrated Ballistics Information Network) lead was generated from the homicide of Aftab Hussein on July 26, 2022, and the homicide of

Muhammad Afzaal Hussain on August 1, 2022. Through a review of the 7.62X39 casings from both scenes, I learned that the casings were identified as being fired from the same firearm.

## August 8, 2022

The Albuquerque Police Department (APD) and Federal Bureau of Investigations FBI received multiple tips in reference to one male, Muhammad Atif Syed. The tipsters who called in stated that Muhammad was the shooter in the homicides of the Muslim men in Albuquerque. The tips also provided a vehicle, a gray Volkswagen sedan, as the vehicle driven by Muhammad. I also learned that APD ISU Detective C. Maes located a phone number for Muhammad Atif Syed. The phone number Detective Maes located was ▮▮▮▮▮▮▮▮▮▮▮

Detective C. Maes located a possible address for Muhammad Atif Syed at ▮▮▮▮▮▮▮▮▮▮▮ Albuquerque NM ▮▮▮▮

### 1059 hours
ISU Detectives J. Jones positively identified Muhammad Atif Syed exiting ▮▮▮▮▮▮▮▮▮▮▮ and driving to Costco located at 500 Eubank Blvd NE. Muhammad was identified driving a gray 2015 Honda sedan. The Honda sedan did not have a license plate affixed to the back of the vehicle. Muhammad then drove back to 3512 Crest Ave SE #A at approximately 1200 hours.

### 1300 hours
Detective C. Maes contacted me and stated they located a gray Volkswagen Jetta at ▮▮▮▮▮▮▮▮▮▮ The hubcaps appear to have been taken off the wheels of the vehicle. Detective C. Maes was able to provide me with photographs of the vehicles located at Muhammad's residence. I observed in the photographs a gray 4-door Volkswagen Jetta, a silver 4-door sedan with a temporary tag and a black hood with a lion cover, a white 4-door sedan with no license plate, a silver 4-door sedan with a sunroof, and a gray 4-door sedan without a license plate.

### 1343 hours
I received a briefing with ATF Special Agent B. Hutson in reference to guns purchased by Muhammad Atif Syed, Muhammad's son, Adil Syed, date of birth ▮▮▮▮▮▮ and Muhammad's other son, Shaheen Syed also known as Maiwand Syed. I learned the following information:

Special Agent (SA) B. Hutson and R. Alonzo met with management at Omi Arms located at 11215 Central Ave NE. SA Hutson and Alonzo learned the following information:

### January 28, 2021
- Muhammad Atif Syed purchased an HS Produkt, XDM 9mm pistol, S/N: BY478389

ATF Special Agents A. Garcia and K. Wolf contacted the manager at Roof Korean Custom Gunsmithing located at 10100 Acoma Rd. SE Suite A. SA Garcia learned the following information:

### May 28, 2022
- Muhammad Atif Syed purchased a new hammer for his AK-47 from Roof Korean.

### August 1, 2022
- Muhammad Atif Syed obtained a scope for his AK-47

SA Garcia was able to obtain video surveillance footage from Roof Korean from August 1, 2022. The video surveillance footage shows Muhammad Atif Syed and Shaheen "Maiwand" Syed exiting a gray Volkswagen Jetta and entering Roof Korean. This vehicle matches the vehicle previously seen in the video surveillance footage at 230 Truman St. SE. This video also matches the vehicle located by Detectives C. Maes.

**1654 hours**

I received a secondary brief from ATF SA B. Hutson in reference to gun purchases by the Syed family. I learned that Muhammad Atif Syed and his son purchased firearms at BMC Tactical located at 2617 Coors Blvd SW. I learned the following information:

**July 15, 2022**

- Muhammad Atif Syed purchased a ZASTAVA ARMS, ZPAPM70, 7.62X39 rifle, S/N: Z70133061
- Shaheen Syed purchased a ZASTAVA ARMS, ZPAPM92, 7.62X39 pistol, S/NZ92-104752

It should be noted that the 7.62X39 caliber and 9mm were the two calibers of weapon used in the above-mentioned homicides. This is consistent with the types of firearms recently purchased by Muhammad Atif Syed and his sons.

**2329 hours**

I received a call from Detective C. Maes who stated Muhammad Atif Syed left the residence at 3513 Crest Ave SE #A and began driving east on Interstate 40 in the gray Volkswagen Jetta, with the hubcaps, removed.

Detectives were able to detain Muhammad in Santa Rosa, NM. Muhammad told officers he has a firearm inside of his vehicle. Detectives observed Muhammad's cellular phone in the front seat of the vehicle.

**August 9, 2022**

**0115 hours**

MCST Detective A. Ortiz executed a search warrant at Muhammad Atif Syed's residence located at 3513 Crest Ave SE #A. During the execution of the search warrant, two rifles were located in the residence. One rifle, ZASTAVA ARMS, ZPAPM70, 7.62X39 rifle, S/N: Z70133061 was located inside the northeast bedroom which was identified as Muhammad Atif Syed's bedroom by identification cards and documents. A second rifle, ZASTAVA ARMS, ZPAPM92, 7.62X39 pistol, S/NZ92-104752 was located in the back bedroom identified as Shaheen Syed's bedroom. A rifle scope was also located inside the residence.

Both rifles were collected, test fired, and the casings were sent to NIBIN for a general comparison.

**0629 hours**

I conducted a recorded interview with Shaheen "Maiwand" Syed at the Albuquerque Police Department Main Police Station. I read Shaheen his constitutional rights, afforded to him under Miranda, which he stated he understood. Shaheen provided the following information: Shaheen is the son of Muhammad Atif Syed. Shaheen lives at                        with his father and family. In July, Shaheen purchased an AK-47 pistol from BMC Tactical and his father purchased an AK-47. Shaheen identified the vehicle, a gray 2017 Volkswagen Jetta, VIN:                        to belong to his father, Muhammad Atif Syed. On August 1, 2022, Shaheen went with Muhammad to Omni Arms located at 11215 Central Ave NE. The two then went to Roof Korean Gunsmithing located at 10100 Acoma Rd. SE Suite A. At this location, Muhammad purchased a scope for his AK-47. Shaheen stated the AK-47 his father purchased the scope for is the same AK-47 his father purchased from BMC Tactical in July (ZASTAVA ARMS, ZPAPM70, 7.62X39 rifle, S/N: Z70133061). Shaheen stated he drove with his father to both stores in his father's Gray Volkswagen Jetta. I asked Shaheen if he was allowed to take Muhammad's AK-47 and shoot it. Shaheen stated he is not allowed to touch or take his father's guns. Shaheen told me Muhammad has a 9mm Springfield handgun as well. Shaheen said he and his siblings have never handled this firearm as they are not allowed to touch it. Shaheen, I asked Shaheen if he was in Muhammad's gray Volkswagen when Muhammad Zaher Ahmadi, Aftab Hussain, Muhammad Afzal Hussain, or Naeem Hussain were shot and killed. Shaheen stated he know about the shooting and that he did not shoot the victims in this case.

**0645 hours**

MCST Detective A. Ortiz executed a search warrant for Muhammad Atif Syed's gray 2017 Volkswagen Jetta, bearing a New Mexico license plate of        (license plate not registered to this vehicle). During the execution

of the search warrant, Detective Ortiz located one 9mm casing between the windshield and hood area of the vehicle, two 7.62X39 casings inside the vehicle, and a 9mm handgun (S/N BY478389, Springfield Armory)

The 9mm handgun was testfired and the casing, along with the 7.62X39 and 9mm casings were entered into NIBIN for a general comparison.

## 0824 hours

A NIBIN lead was received for the casings from the homicides on July 26, 2022, August 1, 2022, and the test fires from Muhammad Atif Syed's ZASTAVA ARMS, ZPAPM70, 7.62X39 rifle, S/N: Z70133061. I learned that Muhammad's rifle fired the casings located at the homicide on July 26, 2022, and the homicide on August 1, 2022.

## 0905 hours

Detective J. Garcia conducted a recorded interview with Muhammad Atif Syed at the Albuquerque Police Department Main Police Station. Detective Garcia, with the assistance of a Pashto interpreter, read Mohammah his constitutional rights, afforded to him under Miranda, which he stated he understood. Muhammad provided the following information: The gray 2017 Volkswagen Jetta, VIN: ▮▮▮▮▮▮▮▮▮▮▮ was purchased by his son, Adil, about 3 months prior to this date. Adil then sold the gray Volkswagen Jetta to his father, Muhammad. Muhammad stated the vehicle is now his vehicle. On August 8, 2022, at approximately 9:00 PM, Muhammad said he was driving to Houston, TX to find a new place for his family to live because the situation in Albuquerque was bad. Muhammad then referenced the shooting of Muslims on the news. Muhammad took with him; clothing, shoes, and a pistol or handgun. Muhammad told Detective Garcia the gun is his gun and no one else uses the gun. Muhammad said he also owns an AK-47 and likes the platform because he had one in Afghanistan. Muhammad keeps his AK-47 in a cardboard box, under his bed, in his bedroom. Muhammad stated he will sometimes take Shaheen to the desert to shoot his AK-47. Muhammad refers to this as "hunting." Muhammad said his son, Shaheen also purchased an AK-47 pistol that carries 7.62X39 rounds. Muhammad told Detective Garcia that he was with Special Forces in Afghanistan and fought against the Taliban. Muhammad has known Naeem Hussain since 2016 and recognized Aftab Hussein from parties in the community. Muhammad denied having any involvement in the murders in this case.

## 1142 hours

A NIBIN lead was received for the 9mm handgun (S/N BY478389, Springfield Armory) taken from Muhammad Atif Syed's 2017 gray Volkswagen Jetta, the 9mm casings on the homicide at 422 Cornell Dr. SE, on August 1, 2022, and the 9mm casing located between the windshield and hood area of Muhammad's 2017 Volkswagen Jetta. I learned that all three casings had a presumptive match to one another.

Based on the aforementioned facts, I am respectfully requesting an arrest warrant be issued for **Mohammad Atif Syed** for the listed charges.

Contrary to Section(s) **30-2-1 (x2)** _____ NMSA 1978.

**I SWEAR OR AFFIRM UNDER PENALTY OF PERJURY THAT THE FACTS SET FORTH ABOVE ARE TRUE TO THE BEST OF MY INFORMATION AND BELIEF. I UNDERSTAND THAT IT IS A CRIMINAL OFFENSE SUBJECT TO THE PENALTY OF IMPRISONMENT TO MAKE A FALSE STATEMENT IN A CRIMINAL COMPLAINT.**

| | |
|---|---|
| David Murphy, District Court Judge | |
| **JUDGE** | **AFFIANT** |
| 8/9/22 | 8/9/2022          5168 |
| **DATE** | **DATE**          **MAN NO.** |
| | CASE:22-0058958/CAD:222131198 |

| | | |
|---|---|---|
| DDA J. Duran | 8/9/2022 | |
| **ASSISTANT DISTRICT ATTORNEY** | **DATE** | **APD CAD INCIDENT OR CASE #** |

This complaint may not be filed without the prior payment of a filing fee, unless approved by the District Attorney or a law enforcement officer authorized to serve an Arrest or Search Warrant. Approval of the District Attorney or a law enforcement officer is not other wise required.

CF001
METROPOLITAN COURT RULE 7-201

Approved: Supreme Court, October 1, 1974; amended effective September 1, 1990;April 1, 1991; November 1, 1991.

❑ - Court      ❑ - Defendant      ❑ - Attorney      ❑ - District Attorney

*F/c copy*

Metropolitan Court Rule 49
STATE OF NEW MEXICO

**IN THE METROPOLITAN COURT** NO. T-4-FR-2022-3762

STATE OF NEW MEXICO
- VS -

NAM:  Syed, Muhammad Atif

F A X E D

AUG 0 9 2022

BY: 212 LeNB

## WARRANT FOR ARREST

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT
You are hereby commanded to arrest the above-named defendant and bring the defendant without unnecessary
delay before me to answer the charge of: **Murder (Open count) X2**

**BOND:** ___No Bond Hold___

Contrary to Section (s) **30-2-1 (x2)** NMSA 1978

Dated this ___9th___ Day of ___August___ , 2022  _____
                                                                    **JUDGE**

## RETURN WHERE DEFENDANT IS FOUND

I arrested the above-named defendant on the _____ Day of _____ , 2022

And served a copy of this warrant on the _____ Day of _____ , 2022

| **EXTRADITION APPROVAL** |
| --- |
|  |

_____
**SIGNATURE**

_____
**TITLE**

An Arrest Warrant may be directed to a full-time salaried state or county law enforcement officer, a municipal
police officer, a campus security officer, or an Indian tribal or pueblo law enforcement officer.

If the judge is unavailable, defendant must be brought forthwith before designee for setting of conditions of
release. A defendant accused of a bailable offense may not be held without the setting of conditions of release
(Magistrate Court Rule 18)

ORIGINAL SIGNED COPY-COURT; ADDITONAL COPIES- DEFENDANT AND ADMINISTRATOR'S COPY

T-4-FR-2022-3762-1
COUNTY OF BERNALILLO

**IN THE METROPOLITAN COURT** NO. T-4-FR-2022-3762

STATE OF NEW MEXICO
- VS -
NAM: Syed, Muhammad Atif



# WARRANT FOR ARREST

THE STATE OF NEW MEXICO TO ANY OFFICER AUTHORIZED TO EXECUTE THIS WARRANT
You are hereby commanded to arrest the above-named defendant and bring the defendant without unnecessary delay before me to answer the charge of: **Murder (Open count) X2**

**BOND:** No Bond Hold

Contrary to Section (s) **30-2-1 (x2)** NMSA 1978

Dated this ___9th___ Day of ___August___ , 2022

_____
**JUDGE**

## RETURN WHERE DEFENDANT IS FOUND

I arrested the above-named defendant on the _____ Day of _____ , 2022

And served a copy of this warrant on the _____ Day of _____ , 2022

| **EXTRADITION APPROVAL** |
|---|

_____
SIGNATURE

_____
TITLE

An Arrest Warrant may be directed to a full-time salaried state or county law enforcement officer, a municipal police officer, a campus security officer, or an Indian tribal or pueblo law enforcement officer.

If the judge is unavailable, defendant must be brought forthwith before designee for setting of conditions of release. A defendant accused of a bailable offense may not be held without the setting of conditions of release (Magistrate Court Rule 18)

ORIGINAL SIGNED COPY-COURT; ADDITONAL COPIES- DEFENDANT AND ADMINISTRATOR'S COPY

# Pretrial Services
## Public Safety Assessment - Court Report

| Name: Muhammad Syed | Case Number: T-4-FR-2022-003762 | PID: 9854056 |
|---|---|---|
| | PSA Assessment Date: 8/10/2022 | Arrest Date: 8/9/2022 |

New Violent Criminal Activity Flag:  No

New Criminal Activity Scale

| 0 | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|

Failure to Appear Scale

| 0 | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|

| Charge(s): | Count(s) | Statute | Degree |
|---|---|---|---|
| Open Count of Murder in the First Degree | 2 | 30-2-1 | Capital Felony |

| Risk Factors: | Responses: |
|---|---|
| 1. Age at Current Arrest | 23 or older |
| 2. Current Violent Offense | Yes |
|    a. Current Violent Offense & 20 Years Old or Younger | No |
| 3. Pending Charge at the Time of the Offense | No |
| 4. Prior Misdemeanor Conviction | No |
| 5. Prior Felony Conviction | No |
|    a. Prior Conviction | No |
| 6. Prior Violent Conviction | 0 Violent Convictions |
| 7. Prior Failure to Appear in Past 2 Years | 1 |
| 8. Prior Failure to Appear Older than 2 Years | No |
| 9. Prior Sentence to Incarceration | No |

Recommendations:  **(H) ROR - PML 1**

Notes:

| | | New Criminal Activity Scale | | | | | |
|---|---|---|---|---|---|---|---|
| | | NCA 1 | NCA 2 | NCA 3 | NCA 4 | NCA 5 | NCA 6 |
| **Failure to Appear Scale** | FTA 1 | (A) ROR | (B) ROR | | | | |
| | FTA 2 | (C) ROR | (D) ROR | (E) ROR-PML1 | (F) ROR-PML3 | (G) ROR-PML4 | |
| | FTA 3 | | *(H) ROR-PML1* | (I) ROR-PML2 | (J) ROR-PML3 | (K) ROR-PML4 | (L)DETAIN if const. reqs. met OR RELEASE with max conditions |
| | FTA 4 | | (M) ROR-PML1 | (N) ROR-PML2 | (O) ROR-PML3 | (P) ROR-PML4 | (Q)DETAIN if const. reqs. met OR RELEASE with max conditions |
| | FTA 5 | | (R) ROR-PML2 | (S) ROR-PML2 | (T) ROR-PML3 | (U)DETAIN if const. reqs. met OR RELEASE with max conditions | (V)DETAIN if const. reqs. met OR RELEASE with max conditions |
| | FTA6 | | | | (W)DETAIN if const. met OR RELEASE with max conditions | (X)DETAIN if const. reqs. met OR RELEASE with max conditions | (Y)DETAIN if const. reqs. met OR RELEASE with max conditions |

# MDC Detention Center
# OFFENDER BOOKING SHEET

Report Date/Time: 08/09/22 23:09

Name: **SYED, MUHAMMAD ATIF**          Booking #: **22-09123**

## OFFENDER ADDRESS



## IDENTIFICATION

| Type | Number |
|------|--------|
| FBI  |        |
| AFIS Number | 1X18E2CPA |
| State ID | NM615425 |

*FELONY*

## OFFENDER DESCRIPTION

## SECURITY ALERTS

Alerts:

| Start Date | End Date | Code | Comments |
|------------|----------|------|----------|

## ADMISSION DETAILS

Admit Date: **08/09/2022**     Admit Time: **23:08**     Cash on Admission:   *FELONY*

Booking Officer: **Chavez, Beatrice**

Searched By:   MAI, ADAM

## ARREST DETAILS

| Date Time | Agency | Officer | ORI# | Arrest Address |
|-----------|--------|---------|------|----------------|
| 08/09/2022  14:06 | ALB POLICE | #6817 PHILIP NEIS | | 400 ROMA AVE NW ALBUQUERQUE NM |

RECEIVED

AUG 0 9, 2022

METROPOLITAN COURT

Offender Booking Sheet

Name: **SYED, MUHAMMAD ATIF**

Booking #: **22-09123**

| | CASE CHARGE DETAILS AND DISPOSITION | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Case Number | Type | Statute | Description | Disposition | Discharge Type | Discharge Date | Bail |
| 1 T4FR2022003762 | Open Charge Warrant | 30-02-01(A)(1) | "Open Count of Murder in the first degree (willful & deliberate, felony murder, or depraved mind)" | HOLD | | | $0 |
| | | 30-02-01(A)(1) | "Open Count of Murder in the first degree (willful & deliberate, felony murder, or depraved mind)" | | | | |
| | | | | | | | $0 |

**RECEIVED**

AUG 0 9 2022

METROPOLITAN COURT

# EXHIBIT F

**FILED**
**2ND JUDICIAL DISTRICT COURT**
**Bernalillo County**
**8/22/2022 3:18 PM**
**CLERK OF THE COURT**
**Malcolm W Smith**

SECOND JUDICIAL DISTRICT COURT
COUNTY OF BERNALILLO
STATE OF NEW MEXICO
D202CR **2022** 0 1 8 6 8

Case No. _____
DA#: 2022-04645-1
LR#:

STATE OF NEW MEXICO,
      Plaintiff,      **CLARA MORAN**

  vs.

MUHAMMAD ATIF SYED,
A.K.A.(s): MUHAMMAD ATIF SYED; SYED MUHAMMAD ATIF; ATIF SYED; ATIF
MUHAMMAD SYED; MIHAMMAD ATIF SYED; MUHAMMAD SYED
      Defendant

## CRIMES CHARGED

FIRST DEGREE MURDER (WILLFUL AND DELIBERATE), SECOND DEGREE MURDER
(FIREARM ENHANCEMENT) AND VOLUNTARY MANSLAUGHTER (FIREARM
ENHANCEMENT) (0001), FIRST DEGREE MURDER (WILLFUL AND DELIBERATE),
SECOND DEGREE MURDER (FIREARM ENHANCEMENT) AND VOLUNTARY
MANSLAUGHTER (FIREARM ENHANCEMENT) (0001), FIRST DEGREE MURDER
(WILLFUL AND DELIBERATE), SECOND DEGREE MURDER (FIREARM
ENHANCEMENT) AND VOLUNTARY MANSLAUGHTER (FIREARM ENHANCEMENT)
(0001), TAMPERING WITH EVIDENCE (4230), TAMPERING WITH EVIDENCE (4230),
TAMPERING WITH EVIDENCE (4230), TAMPERING WITH EVIDENCE (4230)

## GRAND JURY INDICTMENT

THE GRAND JURY CHARGES:

     COUNT 1:  FIRST DEGREE MURDER (WILLFUL AND DELIBERATE), SECOND
DEGREE MURDER (FIREARM ENHANCEMENT) AND VOLUNTARY MANSLAUGHTER
(FIREARM ENHANCEMENT) (0001)

    That on or about July 26, 2022, in Bernalillo County, New Mexico, the above-named
defendant did kill Aftab Hussein, with the deliberate intention to take away the life of Aftab
Hussein, or any other human being, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994); AND
FURTHERMORE, the defendant is hereby notified that upon trial of this cause the finder of fact
may be instructed to consider Murder in the Second Degree (Firearm Enhancement), contrary to
NMSA 1978, Section 30-2-1(B) (1994) and 31-18-16 (1993), or Voluntary Manslaughter
(Firearm Enhancement), contrary to NMSA 1979. Section 30-2-3 (1994) and 31-18-16 (1993).

COUNT 2: FIRST DEGREE MURDER (WILLFUL AND DELIBERATE), SECOND DEGREE MURDER (FIREARM ENHANCEMENT) AND VOLUNTARY MANSLAUGHTER (FIREARM ENHANCEMENT) (0001)

That on or about August 1, 2022, in Bernalillo County, New Mexico, the above-named defendant did kill Mohammud Afzaal Hussain, with the deliberate intention to take away the life of Mohammud Afzaal Hussain, or any other human being, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994); AND FURTHERMORE, the defendant is hereby notified that upon trial of this cause the finder of fact may be instructed to consider Murder in the Second Degree (Firearm Enhancement), contrary to NMSA 1978, Section 30-2-1(B) (1994) and 31-18-16 (1993), or Voluntary Manslaughter (Firearm Enhancement), contrary to NMSA 1979, Section 30-2-3 (1994) and 31-18-16 (1993).

COUNT 3: FIRST DEGREE MURDER (WILLFUL AND DELIBERATE), SECOND DEGREE MURDER (FIREARM ENHANCEMENT) AND VOLUNTARY MANSLAUGHTER (FIREARM ENHANCEMENT) (0001)

That on or about August 5, 2022, in Bernalillo County, New Mexico, the above-named defendant did kill Naeem Hussein, with the deliberate intention to take away the life of Naeem Hussein, or any other human being, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994); AND FURTHERMORE, the defendant is hereby notified that upon trial of this cause the finder of fact may be instructed to consider Murder in the Second Degree (Firearm Enhancement), contrary to NMSA 1978, Section 30-2-1(B) (1994) and 31-18-16 (1993), or Voluntary Manslaughter (Firearm Enhancement), contrary to NMSA 1979, Section 30-2-3 (1994) and 31-18-16 (1993).

COUNT 4: TAMPERING WITH EVIDENCE (4230)

That on or between August 05, 2022 and August 9, 2022, in Bernalillo County, New Mexico, the above-named defendant destroyed, changed, hid, fabricated, or placed hubcaps from Volkswagen Jetta with the intent to prevent the apprehension, prosecution or conviction of himself and the highest crime was a capital crime, a first or second degree felony, contrary to NMSA 1978, Section 30-22-5 (2003).

COUNT 5: TAMPERING WITH EVIDENCE (4230)

That on or between August 05, 2022 and August 9, 2022, in Bernalillo County, New Mexico, the above-named defendant destroyed, changed, hid, fabricated, or placed a rifle with the intent to prevent the apprehension, prosecution or conviction of himself and the highest crime was a capital crime, a first or second degree felony, contrary to NMSA 1978, Section 30-22-5 (2003).

COUNT 6: TAMPERING WITH EVIDENCE (4230)

That on or between August 05, 2022 and August 9, 2022, in Bernalillo County, New Mexico, the above-named defendant destroyed, changed, hid, fabricated, or placed a cell phone under a mattress and/or carpet with the intent to prevent the apprehension, prosecution or conviction of himself and the highest crime was a capital crime, a first or second degree felony, contrary to NMSA 1978, Section 30-22-5 (2003).

COUNT 7: TAMPERING WITH EVIDENCE (4230)



That on or between August 05, 2022 and August 9, 2022, in Bernalillo County, New Mexico, the above-named defendant destroyed, changed, hid, fabricated, or placed a Volkswagen Jetta with the intent to prevent the apprehension, prosecution or conviction of himself and the highest crime was a capital crime, a first or second degree felony, contrary to NMSA 1978, Section 30-22-5 (2003).

The names of the witnesses upon whose testimony this Indictment is based are as follows:

APD Leah Wise #5168

I hereby certify that the foregoing Indictment is a _____ True _____ Bill.

APPROVED:

_____ for
Greer Staley, Assistant District Attorney

_____
Foreman

August 19, 2022
Date

## CASE INFORMATION

DA FILE#:  2022-04645-I
MET.CT.#:  T-4-FR-2022-003762
LR#:
LEA/RPT#:  Albuquerque Police Department / 22-0057197;22-0058958
PROSECUTOR:  Greer Staley, Assistant District Attorney



BOOKING/ARREST DATE: August 09, 2022
BOOKING/ARREST#:  22-09123
STN: Not Available
DEF ATTY:      Mrs Megan Mitsunaga
                518 Slate Ave NW
                Albuquerque, NM  87102
                505-280-9548

PHYSICAL DESCRIPTION OF DEFENDANT:




VG

## PENALTIES

Count 1: **First Degree Murder (Willful and Deliberate)(0001)**,, a Capital Offense with a basic sentence of Life Imprisonment. **Second Degree Murder**, a second degree felony with a basic sentence of fifteen years imprisonment and a fine of not more than $12,500. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022. **Voluntary Manslaughter**, a third degree felony with a basic sentence of six years imprisonment and a fine of not more than $15,000. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022.

Count 2: **First Degree Murder (Willful and Deliberate)(0001)**,, a Capital Offense with a basic sentence of Life Imprisonment. **Second Degree Murder**, a second degree felony with a basic sentence of fifteen years imprisonment and a fine of not more than $12,500. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022. **Voluntary Manslaughter**, a third degree felony with a basic sentence of six years imprisonment and a fine of not more than $15,000. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022.

Count 3: **First Degree Murder (Willful and Deliberate)(0001)**,, a Capital Offense with a basic sentence of Life Imprisonment. **Second Degree Murder**, a second degree felony with a basic sentence of fifteen years imprisonment and a fine of not more than $12,500. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022. **Voluntary Manslaughter**, a third degree felony with a basic sentence of six years imprisonment and a fine of not more than $15,000. **(Firearm Enhancement)**, a basic sentence of imprisonment increased by 5 years occurring on or after May 18, 2022.

Count 4: **Tampering with Evidence(4230)**, a third degree felony with a basic sentence of three years and a fine of $5,000, followed by two years parole.

Count 5: **Tampering with Evidence(4230)**, a third degree felony with a basic sentence of three years and a fine of $5,000, followed by two years parole.

Count 6: **Tampering with Evidence(4230)**, a third degree felony with a basic sentence of three years and a fine of $5,000, followed by two years parole.

Count 7: **Tampering with Evidence(4230)**, a third degree felony with a basic sentence of three years and a fine of $5,000, followed by two years parole.

**4th Degree Felony**: Basic sentence of 18 months imprisonment and not more than $5,000 fine.
**3rd Degree Felony**: Basic sentence of 3 years imprisonment and not more than $5,000 fine.
**2nd Degree Felony**: Basic sentence of 9 years imprisonment and not more than $10,000 fine.
**1st Degree Felony:** Basic sentence of 18 years imprisonment and not more than $15,000 fine.
**USE or BRANDISHING OF FIREARM ALTERATION TO BASIC SENTENCE (FE):**
Basic sentence of imprisonment increased by 1 year for first offense in which a firearm is used and 3 years for subsequent offenses in which a firearm is used for incidents occurring on or before June 30, 2020; basic sentence of imprisonment increased by 3 years for first offense in which a firearm is brandished and 5 years for subsequent offenses in which a firearm is brandished for incidents occurring on or after July 1, 2020. When the offender is a serious

youthful offender or a youthful offender, the basic sentence may be increased by one year for first offense in which a firearm is brandished and may be increased by 3 years for subsequent offenses in which a firearm is brandished for incidents occurring on or after July 1, 2020.

**USE OF HATE CRIME ENHANCEMENT:** Basic sentence of imprisonment is increased by one (1) year, unless second offense, then the basic sentence is increased by two (2) years.

**Special Penalty**: (Receiving or Transferring a Stolen Vehicle (Possession) only) Basic sentence of one year and/or $5,000 fine.

**Misdemeanor:** Less than 1 year in the County Jail and/or not more than $1,000 fine.

**Petty Misdemeanor**: Not more than 6 months in the County Jail and/or not more than $500 fine.

**Penalty for Driving While Under the Influence - Felony Offense**:
(4th): Basic sentence of 18 months and not more than $5,000 fine, including a mandatory imprisonment term of not less than 6 months;
(5th): Basic sentence of 24 months and not more than $5,000 fine, including a mandatory imprisonment term of not less than 12 months;
(6th): Basic sentence of 30 months and not more than $5,000 fine, including a mandatory imprisonment term of not less than 18 months;
(7th or Subsequent): Basic sentence of 36 months and not more than $5,000 fine, including a mandatory imprisonment term of not less than 24 months.

**Penalty for Driving While Under the Influence - Misdemeanor:** If 1st Offense, basic sentence is maximum 90 days jail and $500 fine, and if aggravated an additional 48 hours jail time; if 2nd Offense, basic sentence is mandatory 72 hours in jail and $500 fine to maximum of 364 days and $1,000 fine, and if aggravated an additional 96 hours jail time; if 3rd Offense, basic sentence is a mandatory 30 days in jail and $750 fine to maximum of 364 days and $1,000 fine, and if aggravated an additional mandatory 60 days jail time.

**Penalty for Driving While License Suspended or Revoked**: Traffic Code Misdemeanor, Special Penalty: not less than 4 days nor more than 364 days and fine up to $1,000 (non-DWI related suspension/revocation); or not less than 7 consecutive days imprisonment and mandatory fine not less than $300 nor more than $1,000 (DWI revocation).

**Penalty for Reckless Driving:** Upon first conviction, basic sentence of 5 days to 90 days imprisonment, and/or $25 to $100 fine. Upon a second or subsequent conviction, basic sentence of 10 days to 6 months imprisonment, and/or $50 to $1,000 fine.

**Penalty for Traffic Code Misdemeanor:** fine of not more than $300 or imprisonment for not more than 90 days or both.

**Penalty Assessment Misdemeanor**: See Schedule in Traffic Code, Section 66-8-116.

**1st Degree Felony for Child Abuse (Intentionally Caused) (Resulting in Death) (Child Under 12):** Life imprisonment.

**2nd Degree Felony Resulting in the Death of a Human Being**: Basic sentence of 15 years but not less than 10 years nor more than 20 years imprisonment and not more than $12,500 fine.

**3rd Degree Felony Resulting in the Death of a Human Being**: Basic sentence of 6 years but not less than 4 years nor more than 8 years imprisonment and not more than $15,000 fine.

**2nd Degree Felony, Sexual Offense Against A Child:** Basic sentence of 15 years imprisonment and not more than $12,500 fine.

**3rd Degree Felony, Sexual Offense Against A Child:** Basic sentence of 6 years imprisonment and not more than $5,000 fine.

## OPEN CHARGE OF MURDER

**Penalty for FIRST DEGREE MURDER (Willful and Deliberate) or (Depraved Mind)**

    **CAPITAL FELONY:** Life Imprisonment, to be followed by a minimum five year parole term upon release.

    **SECOND DEGREE MURDER:** Basic sentence of 15 years imprisonment and not more than $12,500 fine, to be followed by a two year parole term.

    **VOLUNTARY MANSLAUGHTER:** Basic sentence of 6 years imprisonment and not more than $15,000 fine, to be followed by a two year parole term.

    **INVOLUNTARY MANSLAUGHTER:** 4th Degree Felony: Basic sentence of 18 months imprisonment and not more than $5,000 fine, to be followed by a one year parole.

**Penalty for FIRST DEGREE MURDER (Felony Murder):**

    **CAPITAL FELONY:** Life Imprisonment, to be followed by a minimum five year parole term upon release.